**FOX FILM CORPORATION v. TRUMBULL, Governor of Connecticut, et al.**

**AMERICAN FEATURE FILM CO., Inc., v. SAME.**

(District Court, D. Connecticut. August 17, 1925.)

**1. Constitutional law ⬅87—Owners' right to use and lease their films protected property rights.**

Right of owners of films to use and lease them for lawful purposes are property rights, which the Constitution protects.

**2. Constitutional law ⬅276 — Unless within police power, state statute preventing owner from leasing property violative of Fourteenth Amendment.**

State law depriving owner of property of power to make proper contracts respecting it, and to lease it, is violative of Fourteenth Amendment, unless restrictions imposed are within state's police power.

**3. Taxation ⬅608(2)—Illegality of tax alone not ground.**

Illegality of tax alone is not ground for injunction.

**4. Injunction ⬅105(1)—Criminal prosecution generally not restrained.**

Generally court of equity cannot restrain criminal proceedings, unless they are instituted by party to suit already pending before it, and to try the same right that is in issue there.

**5. Injunction ⬅85(2) — Enforcement of invalid law depriving one of use of property and prescribing punishment for violation enjoinable.**

One may have relief by injunction against a law invalid as depriving him of right to sell, lease, or otherwise use his property, if it imposes, as a penalty for its violation, punishment by fine or imprisonment.

**6. Licenses ⬅5 — Criterion of law exacting money from one in business being under taxing power or police power stated.**

Whether law exacting money from one conducting business is enacted under taxing power or police power does not depend on whether the exaction is called a tax or a license fee, but on whether the primary purpose is to raise revenue or regulate an industry; and, if its primary purpose is to regulate or discourage a business, it involves police power.

**7. Licenses ⬅7(1)—Law enacted in exercise of police power not invalid for imposing tax for revenue.**

That a law enacted in the exercise of the police power imposes a tax for revenue, so that it fulfills two functions—that of a police regulation and that of raising revenue—makes it none the less valid.

**8. Constitutional law ⬅251—States have discretion in regulating business under police power.**

In general, each state may determine for itself, in the exercise of its police power, regulations respecting the carrying on of lawful business within its boundaries, so long as they are not so unreasonable that property and personal rights of citizens are unnecessarily and arbitrarily interfered with or destroyed without due process of law.

**9. Theaters and shows ⬅1—Statute requiring registration of films before exhibition of pictures enacted under police power.**

That Laws Conn. 1925, c. 177, requiring registration of films with payment of fee before exhibition of pictures, was enacted in the exercise of police power, held shown by its provisions for issuance of permits, without payment of fee, for certain classes of films, and for cancellation of permits for any films found to be immoral or of a character to offend racial or religious sensibilities.

**10. Injunction ⬅85(2)—Enforcement of unconstitutional state statute, working irremediable injury, enjoined.**

Where state law, not only violates federal Constitution, but its enforcement would work irremediable injury, for which there is no adequate and complete remedy at law, state officers will be enjoined from enforcing it.

**11. Constitutional law ⬅48 — Presumptions and construction in favor of constitutionality.**

A statute will be upheld unless clearly shown unconstitutional; all presumption and reasonable construction being in its favor.

**12. Constitutional law ☜46(1) — Validity of statute not considered unless necessary for case.**

Constitutionality of state statute will not be considered unless the case before the court makes it necessary.

**13. Commerce ☜33—Shipping films into state to lessees interstate commerce.**

Owners of motion picture films, in shipping them from one state into another, to lessees thereof, for purpose of exhibition, are engaged in interstate commerce.

**14. Commerce ☜33 — Interstate commerce ends when articles are at destination.**

Interstate commerce, which begins when the articles are delivered to carrier for transportation, ceases when they have arrived at their destination, and are there held for final disposal or use.

**15. Commerce ☜63—Requiring registration of and payment of tax on motion picture films before exhibition not regulation of or unlawful restraint on interstate commerce.**

Laws Conn. 1925, c. 177, prohibiting delivery of motion picture films for purpose of exhibition in the state without having registered them and paid a tax of $10 for each film of 1,000 feet or less, with 50 cents additional for each extra 100 feet, whether regarded as a revenue measure or police regulation, held not a regulation of or unlawful restraint on interstate commerce, as regards films shipped in to lessees for exhibition; it operating alike on films brought into or produced in the state, being concerned only with public exhibition of moving pictures in the state, and only incidentally affecting interstate commerce.

**16. Theaters and shows ☜2—Censorship provision of film statute held not to vest "arbitrary power" in commissioner; "discretion."**

Laws Conn. 1925, c. 177, prohibiting delivery of motion picture films for purpose of exhibition in the state without previous registration and payment of tax, but providing for permits, without payment of tax, for exhibiting films for promotion of educational, charitable, religious, and patriotic purposes, by the further provision that any permit so granted may be canceled "within the discretion of the commissioner," and in such case the tax shall be paid by the exhibitor, held not to give the commissioner "arbitrary power" (that is, power to act according to his own will, without being furnished adequate determining principal), but to authorize him only to determine whether the film was of the character required by the statute and represented by applicant for permit, which involves administrative "discretion."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Discretion.]

**17. Statutes ☜64(8)—Even if part of film registration act were invalid, held it would not impair rest of statute.**

Even if the part of Laws Conn. 1925, c. 177, for registration of films before delivery for exhibition, which authorizes commissioner in his discretion to cancel a permit for certain class of films, were invalid, held, under established rule, that it would not impair the rest of the act.

**18. Theaters and shows ☜2—Arbitrary power not given commissioner by authority to revoke registration of immoral film.**

Arbitrary power is not delegated by Laws Conn. 1925, c. 177, for registration of films before exhibition in state, by its authority to commissioner to revoke registration of any film which he shall find to be immoral or of a character to offend the racial or religious sensibilities of any element of society.

**19. Constitutional law ☜42 — Constitutionality not determined when statute not shown to affect party.**

Constitutionality of a statute will usually not be determined, where a party does not show that he is in any way affected by its provision.

In Equity. Two suits, one by the Fox Film Corporation, the other by the American Feature Film Company, Inc., both against John H. Trumbull, Governor of Connecticut, and others. Bills dismissed.

Benedict M. Holden, of Hartford, Conn., and Cadwalader, Wickersham &. Taft, of New York City (George W. Wickersham and Edwin P. Grosvenor, both of New York City, of counsel), for plaintiffs.

Frank E. Healy, Atty. Gen., and Shipman & Goodwin, of Hartford, Conn. (Arthur L. Shipman, of Hartford, Conn., of counsel), for defendants.

The Federal Motion Picture Council in America, Inc., filed a brief as amicus curiæ.

Before ROGERS, Circuit Judge, and GODDARD and THACHER, District Judges.

ROGERS, Circuit Judge. This court has been specially constituted in accordance with section 266 of the Judicial Code of the United States (Comp. St. § 1243). That section makes it necessary, when the question is presented whether an injunction shall issue restraining the enforcement of any statute of a state by a state officer, upon the ground of the unconstitutionality of the statute, that the question raised shall be determined by a court of three judges, of whom at least one shall be a Justice of the Supreme Court or a Judge of the Circuit Court of Appeals.

The court in this case is asked to enjoin the enforcement of an act passed by the General Assembly of the state of Connecticut at its last session, upon the ground that it constitutes an unlawful restraint and burden upon interstate commerce, that its enforcement would abridge the privileges and immunities of citizens of the United States,

and would deprive plaintiffs of their property without due process of law, and deny to plaintiff the equal protection of the laws, all contrary to the provisions of the Constitution of the United States.

The act complained of is entitled "An act providing for the imposition of a tax on films from which motion pictures are to be exhibited within the state." It was passed by the General Assembly of Connecticut at its biennial session in 1925. It was approved by the Governor on June 24, 1925, and is chapter 177 of the Laws of 1925. It went into effect on July 1, 1925.

Section 1 of the act complained of is as follows: "No person, firm, corporation or other association shall deliver any motion picture film or copy therof for the purpose of exhibiting in this state any motion picture therefrom without having registered the same and paid the tax thereon as required by the provisions of this act. The amount of such tax including the fee for registration of each such reel of film or copy thereof of one thousand feet or less, shall be ten dollars, and, for each one hundred feet of film in addition to one thousand feet contained in any reel, fifty cents, which amount shall be paid to the tax commissioner at the time of such registration."

Section 2 provides in part as follows: "The provisions hereof shall not be construed to require registration or payment of any tax on reels commonly called news reels and which portray current events. On application, to be made on forms to be prescribed and furnished by the commissioner, he may issue permits for the delivery of, to exhibitors, without payment of any tax, reels of films from which may be shown pictures of a strictly scientific character and intended for the use of the learned professions, and reels for the exhibition of pictures for the promotion of educational, charitable, religious and patriotic purposes and for the instruction of employees by employers of labor. Each such reel shall bear a seal showing that permission for delivery thereof and exhibition of pictures therefrom has been granted by the state, but any permit so granted may be canceled within the discretion of the commissioner, and, in case of such cancellation, the tax due thereon shall be paid by the exhibitor thereof. * * * The commissioner may require exhibitors to keep such records and render such reports as may be necessary to ascertain whether films from which pictures are or have been exhibited by them respectively have been registered and the tax thereon

duly paid. The tax commissioner, by himself or by any person whom he may designate for such purpose, may enter the place of business of any exhibitor of motion pictures for the purpose of ascertaining whether the provisions of this act have been complied with."

And section 4 provides in part as follows: "Any person, by himself or as agent or employee of any corporation, company or association, who shall deliver any film or copy thereof in violation of the provisions of this act shall be fined not more than one hundred dollars or imprisoned not more than sixty days or both. Any motion picture operator or exhibitor who shall fail to comply with the regulations of the commissioner authorized by the provisions hereof shall forfeit his license to operate a moving picture machine within this state for a period not exceeding six months. Any motion picture operator who shall exhibit any picture from any film required to be registered as provided herein which has not been so registered and the tax thereon paid shall be fined not more than one hundred dollars or imprisoned not more than thirty days or both. In case of a second conviction of any licensed operator for violation of any provision of this act, the license of such operator shall be suspended for a period not exceeding one year."

The Fox Film Corporation is a New York corporation, with its principal place of business in the city of New York. It appears that all the photoplay negative and positive films produced by it are made in the states of New York and California and are copyrighted. None is made in Connecticut. The plaintiff solicits, through its agents in Connecticut, contracts to exhibit its positive films under contracts which are signed in Connecticut and sent to New York for acceptance by plaintiff, and, when accepted there, returned to the exhibitor in Connecticut. Films sent for exhibition pursuant to these contracts are forwarded from points outside of the state of Connecticut to the branch office of the plaintiff at New Haven, Conn., whence they are delivered to the exhibitor pursuant to such contracts.

The Connecticut act herein involved prohibits the delivery of a film to the exhibitor who has the contract for the first run until the film has been registered and the tax paid.

The American Feature Film Corporation is a Massachusetts corporation, with its principal place of business in the city of Boston. Its business consists in the renting or

leasing of photoplays and films from which motion pictures are to be exhibited. These photoplays and films are not produced by the plaintiff. The plaintiff has a contract with Universal Pictures Corporation, a New York corporation, whose principal office is in New York City, under which contract plaintiff has acquired a franchise or right to distribute and lease to exhibitors, owners, or operators of theaters, in certain parts of New England, the photoplays produced by the Universal Pictures Corporation. Positive prints of the photoplays covered by this contract are shipped to the plaintiff at Boston, Mass., by the Universal Pictures Corporation from the points of production or laboratories of the Universal Corporation, which points are located outside the states of New England.

The plaintiff asserts it is also engaged in the business of distributing, renting, and leasing to exhibitors throughout the state of Connecticut motion picture films produced by other than the Universal Pictures Corporation, and has been so engaged during the past 12 years. The business so carried on has been conducted in the manner hereinabove described, respecting the pictures produced by the Universal Pictures Corporation and leased by the plaintiff to exhibitors in Connecticut east of the Connecticut river. It is and has been the practice of the plaintiff to enter into contracts with exhibitors operating theaters in the state of Connecticut. Salesmen of the plaintiff solicit in Connecticut contracts with the exhibitors there located. After an exhibitor signs a contract for pictures offered by salesmen of the plaintiff, the contract is mailed to the office of the plaintiff at Boston, Mass., for approval and signature by an officer of the plaintiff at Boston, after which it is mailed from Boston to the exhibitor in Connecticut. In many instances Connecticut exhibitors come to the office of the plaintiff in Boston, see screenings of plaintiff's pictures in the Boston Office, and sign in Boston contracts for the exhibition of pictures in their theaters located in Connecticut. In such cases, after signature by the plaintiff, the contract may be handed to the exhibitor in Boston, or it may be mailed subsequently to the exhibitor in Connecticut.

Positive prints of the films contracted to be leased as hereinabove described are shipped by the plaintiff by express or parcel post from the office of the plaintiff in Boston, Mass., to the exhibitor at his exhibition address in Connecticut. The contracts of the plaintiff provide that the delivery to any common carrier in due time, to be transported to its destination before the showing time and date, shall constitute full delivery by the plaintiff. After the exhibition period has been completed by the exhibitor in Connecticut, the film is shipped by express or parcel post to the plaintiff at its Boston office. The contract which the plaintiff has with its Connecticut exhibitors provides that the exhibitor shall return the film to the plaintiff's place of business immediately after the exhibition of the film, by first express.

Plaintiff does not carry any stock of films in the state of Connecticut, either positive or negative films, and has never carried any stock of films at any place in Connecticut. All motion picture films are and have been shipped by the plaintiff as hereinabove described directly from Boston, for delivery to exhibitors for the purpose of exhibiting motion pictures therefrom in Connecticut, and as above stated immediately after exhibition the motion pictures are and have been returned to the plaintiff at Boston. The foregoing description of the manner in which contracts are negotiated and films are delivered pursuant to such contracts is an accurate description of the manner in which the plaintiff has leased films to exhibitors in Connecticut during the past 12 years.

The above statement as to the manner in which the American Feature Film Company carries on its business in Connecticut is verified by its treasurer. The facts as alleged by the plaintiffs are admitted by the defendants with an exception now to be mentioned. The deputy tax commissioner of the state of Connecticut, in an affidavit filed on behalf of defendants, and he is one of them, says: "Generally speaking, the plaintiff will direct an exhibitor in Connecticut to ship the film after the term of exhibition to another exhibitor within the state in the vicinity, where a like process is gone through."

This is in flat contradiction to the statement of the treasurer of the American Feature Film Company, and we are of the opinion that the treasurer of the company is better informed as to the manner in which the business is conducted than is the deputy tax commissioner of the state. The treasurer of the company had been connected with the motion picture business for about 12 years, and for the last 7 years had been and still was its treasurer. It may fairly be assumed that he was familiar with the manner in which its business was carried on.

The New York corporation, the Fox Film

Corporation, in its bill, states that its contracts with exhibitors in Connecticut are obtained by its salesmen or agents who solicit in that state contracts with exhibitors. After the exhibitor has signed the printed contract in which he agrees to exhibit the copyrighted photoplay at his theater and to pay the specified rental, the contract is forwarded from Connecticut to New York, where, if it is approved, it is signed by an officer of the film corporation. The contract contains a provision stating that it is an application for a contract only, is not to become binding until it has been accepted in writing by an officer of the film corporation, and notice of acceptance has been sent to the exhibitor by mail or telegraph.

Pursuant to contracts made as above described, plaintiff either ships from New York directly to the exhibitor in the state of Connecticut the positive prints of the photoplays to be exhibited pursuant to said agreements, such shipment being made either by parcel post, by express, or by truck, or such shipment is made by parcel post or express to a branch office of the film corporation in the city of New Haven, Conn., known as its New Haven exchange, which receives said positive prints from the carrier and makes delivery of the same to the exhibitor, to be exhibited pursuant to the agreement made as aforesaid. In some instances films are delivered at the plaintiff's branch office in New Haven a few days in advance of the date when the same are to be exhibited, but all films belonging to plaintiff at any time in its branch office at New Haven are films which are on their way from the film corporation's laboratories outside of the state of Connecticut to the exhibitor in Connecticut, or are films which have been returned by an exhibitor to the branch office for the purpose of either being returned to the film corporation in New York or elsewhere outside the state of Connecticut, or of being delivered by the branch office to another exhibitor.

[1, 2] The complainants' property rights in their films include the right to use and lease them for lawful purposes, and the Constitution protects these essential attributes of property. No state can make or enforce any law which shall deprive any person of property without due process of law. A law which deprives the owner of property of the power to make proper contracts respecting it, and to lease it, is obnoxious and invalid under the Fourteenth Amendment, unless the restrictions imposed are such as the state may lawfully impose in the exercise of its police powers. Holden v. Hardy, 169 U. S. 366, 391, 18 S. Ct. 383, 42 L. Ed. 780; Terrace v. Thompson, 263 U. S. 197, 216, 217, 44 S. Ct. 15, 68 L. Ed. 255.

[3] It is said that the statute imposes an arbitrary and unjust tax and is therefore illegal. If, for the purpose of the argument, it be assumed to be illegal, and the illegality of the tax is all that is involved in the case, the complainants would have no right to invoke the equitable jurisdiction of this court. If the tax is invalid, they would have a complete and ample remedy at law. They might pay the amount of the tax under protest and at once sue for and recover it back in an action at law. An injunction bill cannot be maintained in equity to restrain the collection of a tax on the sole ground of its illegality. It must present a case which falls within some recognized head of the equity jurisdiction. This was decided as early as the days of Chancellor Kent in Mooers v. Smedley (N. Y.) 6 Johns. Ch. 28. And, as was said in Hannewinkle v. Georgetown, 15 Wall. 548, 21 L. Ed. 231, it "has been so held from that time onward." And see Union Pac. R. Co. v. Cheyenne, 113 U. S. 516, 525, 5 S. Ct. 601, 28 L. Ed. 1098; Shelton v. Platt, 139 U. S. 591, 598, 11 S. Ct. 646, 35 L. Ed. 273; Ogden City v. Armstrong, 168 U. S. 224, 237, 18 S. Ct. 98, 42 L. Ed. 444; Youngblood v. Sexton, 32 Mich. 406, 20 Am. Rep. 654. In Cooley on Taxation (3d Ed.) vol. 2, p. 1415, it is said that "When a tax as assessed is only a personal charge against the party taxed, or against his personal property, it is difficult in most cases to suggest any ground of equitable jurisdiction. Presumptively the remedy at law is adequate."

[4, 5] But that is not all there is in this case, inasmuch as it is provided in section 4 that any person who delivers any film or copy thereof, in violation of the provisions of the act, "shall be fined not more than one hundred dollars or imprisoned not more than sixty days or both." As a general rule, a court of chancery has no power to restrain criminal proceedings, unless they are instituted by a party to a suit already pending before it, and to try the same right that is in issue there. In re Sawyer, 124 U. S. 200, 8 S. Ct. 482, 31 L. Ed. 402. If one is proceeded against criminally under a void statute, he can, of course, show its invalidity in the criminal suit. It is, however, settled that where one is deprived of his right to sell or lease or otherwise use his property, under an act which imposes as a penal-

ty for its violation punishment by fine or imprisonment, one is not obliged to take the risk of prosecution, fine, and imprisonment in order to secure an adjudication of his rights. He may obtain relief by injunction if the law complained of is shown to be void. Terrace v. Thompson, 263 U. S. 197, 216, 44 S. Ct. 15, 68 L. Ed. 255; Packard v. Banton, 264 U. S. 140, 143, 44 S. Ct. 257, 68 L. Ed. 596.

[6] The question whether a law which exacts money from one conducting a business is enacted in the exercise of the taxing power of the state or of the police power does not depend upon whether it is called a "tax" or a license fee. It depends upon whether the primary purpose is to raise revenue or to regulate an industry. If the primary purpose is regulation, it is enacted under the police power, whether it is called a license or a tax. A "tax" may be imposed to discourage or to regulate a business, and when so imposed it involves an exercise of the police power.

In Cooley on Taxation (3d Ed.) vol. 2, p. 1127, it is said: "If, by the common understanding and general custom of the country, a particular duty is regarded as being imposed upon certain individuals, not as their proportionate share in the burdens of government, but because of some special relation to property peculiarly located, or to business peculiarly troublesome or dangerous, so that a requirement that the duty shall be performed by such individuals is usually regarded as only in the nature of regulation of relative obligations and duties through the neighborhood or the municipality, there is no sufficient reason why this may not be considered a mere police regulation, though the proceedings assume the form of taxation, and are even designated by that name."

[7] It is not a valid objection that a law enacted in the exercise of the police power imposes a tax for revenue. That it fulfills two functions—that of a police regulation and that of raising revenue—makes it none the less legal. The business is more easily regulated where a license is imposed upon those who conduct it. Gundling v. Chicago, 177 U. S. 183, 188, 20 S. Ct. 633, 635 (44 L. Ed. 725); Bradley v. Richmond, 227 U. S. 477, 480, 481, 33 S. Ct. 318, 57 L. Ed. 603.

[8] In general it may be said that each state may determine for itself, in the exercise of its police power, regulations respecting the carrying on of a lawful trade or business or occupation within its boundaries, and, "unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for federal interference." Gundling v. Chicago, supra.

The question here raised is a serious and important one. The motion picture industry is understood to be one of the most highly organized and best financed industries in the United States. The motion picture business is of recent origin, and its capacity for good, as well as for evil, is immense. It is an instrument of education, and the public welfare demands that it shall be kept clean and its influence tend to promote what is good and not what is evil. It may be an inestimable asset for human improvement or deterioration as the case may be. This has led certain states, in the exercise of the police power, to legislate on this subject by passing laws to control or supervise the exhibition of moving pictures. New York, Pennsylvania, Ohio, Maryland, Kansas, Florida, Virginia, and Connecticut have passed statutes with this end in view. The power is inherent in the state governments, within constitutional limits to legislate to promote the order, safety, health, morals, and general welfare of society. It is an attribute of sovereignty, and corresponds to the right of self-preservation in the individual. The power is so essential to government that it cannot be abdicated or bargained away, being inalienable even by express grant, and all contract and property rights are held subject to its fair exercise. Atlantic Coast Line R. Co. v. Goldsboro, 232 U. S. 548, 558, 34 S. Ct. 364, 58 L. Ed. 721. It is settled that "the police power embraces regulations designed to promote the public convenience or the general welfare and prosperity, as well as those in the interest of the public health, morals, or safety." Chicago & Alton R. Co. v. Tranbarger, 238 U. S. 67, 77, 35 S. Ct. 678, 682 (59 L. Ed. 1204). It is an application of the maxim sic utere tuo ut alienum non lædas; and to some extent it rests upon the maxim salus populi suprema lex. Litchfield v. Bond, 186 N. Y. 66, 78 N. E. 719.

And the Supreme Court, in Barbier v. Connolly, 113 U. S. 27, 31, 5 S. Ct. 357, 359 (28 L. Ed. 923), held that the Fourteenth Amendment of the Constitution, in declaring that no state shall deprive any person of life, liberty, or property without due pro-

cess of law did not impair the police power of the states. The court said: "But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people. * * *"

There is no doubt that the police power of a state extends to the protection of the public morals by regulating or preventing such acts, practices, and occupations as are immoral or indecent, or which have a tendency to promote immorality or indecency. In Cooley's Constitutional Limitations, that eminent jurist stated the law as follows: "The state has also a right to determine what employments shall be permitted, and to forbid those which are deemed prejudicial to the public good. Under this right it forbids the keeping of gambling houses, and other places where games of chance or skill are played for money, the keeping for sale of indecent books and pictures, the keeping of houses of prostitution and the resort thereto, and in some states the sale of intoxicating drinks as a beverage. These several kinds of business have a tendency which is injurious and demoralizing; and this tendency is recognized even in states where they are not forbidden, and they are subjected to regulations with a view to reducing their evils to a minimum."

[9] That the Connecticut statute is enacted in the exercise of the police power is made clear by the provisions found in section 2, hereinbefore set forth, and which authorizes the commissioner to issue permits for the delivery of certain classes of films without the payment of any fee or tax, and which confers power upon him to cancel permits issued for any film which he finds "to be immoral or of a character to offend the racial or religious sensibilities of any element of society."

[10] The unconstitutionality of a state law is not of itself ground for equitable relief in the courts of the United States. But it is unquestionable that the jurisdiction of this court can and will be exercised to enjoin the enforcement of a law enacted by the General Assembly of the state of Connecticut in any case in which it appears that the law violates the Constitution of the United States, and its enforcement would work irremediable injuries for which there is no adequate and complete remedy at law. Terrace v. Thompson, 263 U. S. 197, 44 S. Ct. 15, 68 L. Ed. 255.

The right to enjoin state officers from enforcing a state statute, enacted in violation of the Constitution of the United States, was determined a hundred years ago in Osborn v. United States Bank, 9 Wheat. 738, 6 L. Ed. 204, in an opinion written by Chief Justice Marshall, and which ever since has been adhered to. Scott v. Donald, 165 U. S. 58, 67, 17 S. Ct. 265, 41 L. Ed. 632; Missouri, K. & T. Ry. Co. v. Missouri Railroad & Warehouse Commissioners, 183 U. S. 53, 59, 22 S. Ct. 18, 46 L. Ed. 78.

[11, 12] Whether the statute complained of does violate the Constitution of the United States is the serious question which the court must determine. And in deciding that question it is to be kept in mind that a statute will be upheld by the courts unless it is clearly shown to be unconstitutional. The statute is regarded as prima facie valid, and the burden to prove the contrary rests on those who challenge its constitutionality. Ex parte Young, 209 U. S. 123, 165, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764. "A statute must be construed, if fairly possible, so as to avoid, not only the conclusion that it is unconstitutional, but also grave doubts upon that score. United States v. Delaware & Hudson Co., 213 U. S. 366, 408 (29 S. Ct. 527, 53 L. Ed. 836); Bratton v. Chandler, 260 U. S. 110, 114, 43 S. Ct. 43, 44 (67 L. Ed. 157). And if the statute is susceptible of two interpretations, one of which would render it constitutional and the other unconstitutional, it is the duty of the court to adopt that construction which will uphold its validity. This is because of the presumption that the lawmaking body intended to act within and not in excess of its constitutional authority. Plymouth Coal Co. v. Commonwealth of Pennsylvania, 232 U. S. 531, 546, 34 S. Ct. 359, 58 L. Ed. 713; South Utah Mines & Smelters v. Beaver County, 262 U. S. 325, 331, 43 S. Ct. 577, 67 L. Ed. 1004. It thus appears how particular courts are to sustain the validity of a statute if it is possible to do so. The federal courts do not consider the constitutionality of a state statute, unless the case before the court makes it necessary. Howat v. Kansas, 258 U. S. 181, 42 S. Ct. 277, 66 L. Ed. 550.

[13] The business in which the plaintiffs in these two suits are engaged is clearly interstate commerce. That is determined for us by the decision in Binderup v. Pathé Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308, as well as by the decision of the Circuit Court of Appeals in this circuit in

Fox Film Corporation v. Federal Trade Commission, 296 F. 353.

[14] Interstate commerce begins when the articles to be carried are committed to a carrier for transportation to the state of its destination or started on their ultimate passage (Coe v. Errol, 116 U. S. 517, 6 S. S. Ct. 475, 29 L. Ed. 715); and interstate commerce ceases when the articles have arrived at their destination and are there held for final disposal or use (Brown v. Houston, 114 U. S. 622, 632, 5 S. Ct. 1091, 29 L. Ed. 257); and it has been held that property is at its destination when it reaches a place where it is held, not in necessary delay or accommodation to the means of transportation, but for the business purposes and profit of its owners. It has been held then to be under the protection of the laws of the state and subject to the taxing and police power of the state. General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754; American Steel & Wire Co. v. Speed, 192 U. S. 500, 519, 24 S. Ct. 365, 48 L. Ed. 538.

The Constitution gives to Congress the right to regulate commerce between the states. It does not, however, define what the term "commerce" means or includes, but, as used, it comprehends intercourse for purposes of trade, and includes among other incidents the transportation of commodities from one state into another state; and the general rule is that goods coming into a state from a foreign state are free from state interference so long as they remain in the original unbroken package. May v. New Orleans, 178 U. S. 496, 20 S. Ct. 976, 44 L. Ed. 1165; Schollenberger v. Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49; Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678; Low v. Austin, 13 Wall. 29, 20 L. Ed. 517. But the cases show that the analogy between imports and articles in original packages in interstate commerce in respect to immunity from taxation fails. In Sonneborn Bros. v. Cureton, 262 U. S. 506, 510, 43 S. Ct. 643, 644 (67 L. Ed. 1095), Chief Justice Taft, writing for the court, stated that "the distinction is that the immunity attaches to the import itself before sale, while the immunity in case of an article because of its relation to interstate commerce depends on the question whether the tax challenged regulates or burdens interstate commerce." And the court held that a tax arising from the sale in Texas of oil in the original packages, in which the oil was shipped from New York, was not illegal as constituting a burden on interstate

commerce. "The interstate transportation was at an end, and, whether in the original packages or not, a state tax upon the oil as property or upon its sale in the state, if the state law levied the same tax on all oil or all sales of it, without regard to origin, would be neither a regulation nor a burden of the interstate commerce of which this oil had been the subject."

In Brown v. Maryland, 12 Wheat. 419, 6 L. Ed. 678, the Supreme Court in 1827 held that a state license tax on sales by importers was invalid as a duty on imports, as the privilege of sale in the original package was essential to the right of import. The plaintiffs in error had been indicted for selling without a license articles imported from abroad. The Court of Appeals sustained the judgment of the court below. In reversing the judgment, Chief Justice Marshall, speaking for the court, held that the statute was repugnant to the constitutional prohibition on the states to lay a duty on imports and to that which declared that Congress shall have power to regulate commerce with foreign states. "There is no difference," he said, "in effect, between a power to prohibit the sale of an article, and a power to prohibit its introduction into the country; the one would be a necessary consequence of the other. No goods would be imported if none could be sold." And further on in his opinion he said: "But while we admit * * * that there must be a point of time when the prohibition ceases, and the power of the state to tax commences, we cannot admit that this point of time is the instant that the articles enter the country." Again he says: "Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce." In the conclusion of his opinion he said: "It may be proper to add that we suppose the principles laid down in this case to apply equally to importations from a sister state. We do not mean to give any opinion on a tax discriminating between foreign and domestic articles."

Notwithstanding the Chief Justice's opinion that the principles laid down in that case applied equally to importations from foreign countries and those coming from a state, the Supreme Court in subsequent decisions has departed therefrom.

In Peirce v. New Hampshire, 5 How. 504,

12 L. Ed. 256, decided in 1847, the court had before it the validity of a New Hampshire statute, which made it an indictable offense to sell spirituous liquors within the state without a license. The defendants had brought into the state from Massachusetts a barrel of gin, and sold it in New Hampshire in the same barrel and in the same condition in which it was purchased in Massachusetts. The sale in New Hampshire was made without a license. The trial court had instructed the jury that, while the state of New Hampshire could not regulate commerce between that state and other states, nor prohibit the introduction of articles from another state, nor prohibit the sale of them, it might pass health and police laws which would to a certain extent affect commerce between the states, and that the New Hampshire statute was a regulation of that character, and constitutional.

The Supreme Court affirmed the case, and Chief Justice Taney, in his separate opinion, said: "Upon the whole, therefore, the law of New Hampshire is, in my judgment, a valid one. For, although the gin sold was an import from another state, and Congress has clearly the power to regulate such importations, under the grant of power to regulate commerce among the several states, yet, as Congress has made no regulation on the subject, the traffic in the article may be lawfully regulated by the state as soon as it is landed in its territory, and a tax imposed upon it, or a license required, or the sale altogether prohibited, according to the policy which the state may suppose to be its interest or duty to pursue."

Peirce v. New Hampshire was overruled in Leisy v. Hardin, hereinafter referred to.

In Woodruff v. Parham, 8 Wall. 123, 19 L. Ed. 382, in 1868, Mr. Justice Miller, writing for the court, commenting upon the remark of Chief Justice Marshall in Brown v. Maryland, supra, to the effect that the principles laid down in that case applied equally to importations from a sister state, refers to it as a "casual remark" which can only be received as an "intimation" of what the court might decide if the case ever came before it. And in the Woodruff Case the court proceeded to decide the proposition exactly contrary to Marshall's "intimation." The question involved was whether an ordinance of the city of Mobile, which imposed a tax upon sales at auction, was valid in so far as it applied to sales of goods brought into the state of Alabama from other states, where the goods were in the original and unbroken packages. The

ordinances imposed the same tax on goods sold at auction, whether or not the goods were brought into the state from another state or were produced in the state of Alabama. The validity of the ordinance was upheld, and the court said: "The case before us is a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by a citizen of Alabama or of another state, and whether the goods sold are the produce of that state or some other. There is no attempt to discriminate injuriously against the products of other states or the rights of their citizens, and the case is not, therefore, an attempt to fetter commerce among the states, or to deprive the citizens of other states of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution which relate to those subjects, and therefore void."

In 1890, in Leisy v. Hardin, 135 U. S. 100, 10 S. Ct. 681, 34 L. Ed. 128, and in Lyng v. Michigan, 135 U. S. 161, 10 S. Ct. 725, 34 L. Ed. 150, in opinions written by Chief Justice Fuller, it was held that a law of a state which forbade sales of merchandise brought into the state from another state, and subjected it to forfeiture, was invalid, because freedom to sell was part of interstate commerce, and interference with such freedom was an obstruction, and would be so regarded as long as the merchandise was unsold and in an original package. And in Sonneborn Bros. v. Cureton, supra, the court, commenting on the above cases, pointed out the radical difference between state legislation preventing any sale at all, and a provision for an occupation tax applicable to all sales of such merchandise, whether domestic or brought from another state. It was said that the one plainly interfered with or destroyed commerce, while the other merely put the merchandise on an equality with all other merchandise in the state, and constituted no real hindrance to introducing the merchandise into the state for sale upon the basis of equal competition.

[15] We are satisfied that the Connecticut statute is not void as constituting a regulation of interstate commerce within the implied prohibition of the Constitution of the United States. The statute does not in terms legislate respecting importations into Connecticut of films brought from outside the state. It operates alike on films brought into the state and those produced in the state. It does not prohibit the bring-

ing into the state of such films or prohibit or regulate the sale of such films. It is concerned only with the public exhibition of moving pictures within the state. Whatever burden or restriction the law imposes is purely incidental in so far as interstate commerce is concerned.

It is undoubtedly true that a state cannot, under cover of exercising its police power, directly regulate or burden interstate commerce. But a police regulation which has real relation to the proper protection of the people, and is reasonable in its terms, and does not conflict with legislation enacted by Congress pursuant to its constitutional authority, is not to be held unconstitutional because it incidentally affects interstate commerce. Savage v. Jones, 225 U. S. 501, 525, 32 S. Ct. 715, 56 L. Ed. 1182.

The exercise by the states of the power to regulate moving picture exhibitions has been sustained by the Supreme Court in a number of cases. Mutual Film Corporation v. Ohio Industrial Commission, 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552; Mutual Film Corporation of Missouri v. Hodges, 236 U. S. 248, 35 S. Ct. 393, 59 L. Ed. 561. And no case has been called to our attention in which such legislation has been held invalid by any court of last resort.

It is argued that the Connecticut statute is void because it constitutes an unlawful restraint upon interstate commerce. A state is without power to regulate, prohibit, or burden interstate commerce. It can no more interfere with commerce which is interstate than it can with that which is foreign. Railroad Co. v. Husen, 95 U. S. 465, 469, 24 L. Ed. 527. In Rosenberger v. Pacific Express Co., 241 U. S. 48, 50, 36 S. Ct. 510, 511 (60 L. Ed. 880), Chief Justice White said that it is settled "and too elementary to require anything but statement that speaking generally the states are without power to directly burden interstate commerce, and that commodities moving in such commerce only become subject to the control of the states or to the power on their part to directly burden after the termination of interstate movement; that is, after the arrival and delivery of the commodities and their sale in the original packages. * * *"

But it is also settled that to bring the case within the rule above stated the interference with interstate commerce must be direct and substantial and not merely incidental. An illustration of this is found in Hendrick v. Maryland, 235 U. S. 610, 35 S. Ct. 140, 59

L. Ed. 385. The court had before it the Motor Vehicle Law of the state of Maryland, which it was alleged constituted an illegal attempt to regulate interstate commerce; passing through states of the Union in automobiles being an act of interstate commerce. The statute prescribed certain regulations governing the operation of automobiles by nonresidents of Maryland over the highways of that state. The movement of motor vehicles over highways, being attended by constant and serious dangers to the public, was regarded as a proper subject of police regulation by the state; and a reasonable license fee on motor vehicles used in interstate commerce was held not to constitute such a direct and material burden on commerce as invalidated the statute. "This," said Mr. Justice McReynolds, "is but an exercise of the police power uniformly recognized as belonging to the states and essential to the preservation of the health, safety, and comfort of their citizens; and it does not constitute a direct and material burden on interstate commerce. The reasonableness of the state's action is always subject to inquiry in so far as it affects interstate commerce, and in that regard it is likewise subordinate to the will of Congress."

In Mutual Film Corporation v. Industrial Commission of Ohio, 215 F. 138, the District Court for the Southern District of Ohio, consisting of one Circuit Judge and two District Judges, had before it the constitutionality of the Ohio statute regulating the public exhibition of motion pictures. It provided for a board of censors of motion picture films, and prohibited the exhibition of such picture films without the approval of the board. It required all films to be submitted to the board "before they shall be delivered to the exhibitor for exhibition," and that "the board shall charge a fee of one ($1.00) dollar for each reel of film to be censored which does not exceed one thousand (1,000) lineal feet. * * *" The court upheld the constitutionality of the act respecting the objection that it violated the commerce clause of the Constitution of the United States and said:

"It is claimed that the statute violates the commerce clause. Substantially all the films supplied by complainants are manufactured outside the state of Ohio. The films are brought into the state in shipping packages containing one or more tin boxes in each of which is a film wrapped on a core. When the packages reach their destination in the state, they are opened and the films

taken off the shipping cores and put on reels, and then placed in the stock of an exchange. The reels are then distributed among the exhibitors and passed from one to another for purposes of public exhibition. Some of these films circulate wholly within Ohio until worn out, while some remain there only for brief periods. It is to the films so placed on reels that the statute applies. The statute in terms limits the duty of the board of censors to examination of 'all motion picture films to be publicly exhibited and displayed in the state of Ohio.' They must be submitted to the board before they are delivered to exhibitors for exhibition, and the fees charged are fixed by uniform rates according to the length of 'each reel of film.' Section 3 of act, supra. We are therefore not concerned with shipping packages which pass into and out of the state in their original form. It cannot be said that the act imposes any sort of burden upon the original shipping packages; for, when the packages are broken and their contents placed upon reels, the films have lost their distinctive character as articles of interstate commerce. May v. New Orleans, 178 U. S. 496, 508, 20 S. Ct. 976, 44 L. Ed. 1165. * * * Above all, the films that are open to action of the board are subject to uniform treatment and charge, no matter in what state they originated or who may own or supply or use them in Ohio and whether such persons be resident therein or not. It is in vain then to urge that the statute violates the commerce clause."

The case went to the Supreme Court of the United States, where it was affirmed in 236 U. S. 230, 35 S. Ct. 387, 59 L. Ed. 552. That court said: "The censorship, therefore, is only of films intended for exhibition in Ohio, and we can immediately put to one side the contention that it imposes a burden on interstate commerce. It is true that according to the allegations of the bill some of the films of complainant are shipped from Detroit, Mich., but they are distributed to exhibitors, purchasers, renters and lessors in Ohio, for exhibition in Ohio, and this determines the application of the statute. In other words, it is only films which are 'to be publicly exhibited and displayed in the state of Ohio' which are required to be examined and censored. It would be straining the doctrine of original packages to say that the films retain that form and composition even when unrolling and exhibiting to audiences, or, being ready for renting for the purpose of exhibition

within the state, could not be disclosed to the state officers. If this be so, whatever the power of the state to prevent the exhibition of films not approved—and for the purpose of this contention we must assume the power is otherwise plenary—films brought from another state, and only because so brought, would be exempt from the power, and films made in the state would be subject to it. There must be some time when the films are subject to the law of the state, and necessarily when they are in the hands of the exchanges ready to be rented to exhibitors or have passed to the latter, they are in consumption, and mingled as much as from their nature they can be with other property of the state. It is true that the statute requires them to be submitted to the board before they are delivered to the exhibitor, but we have seen that the films are shipped to 'exchanges' and by them rented to exhibitors, and the 'exchanges' are described as 'nothing more or less than circulating libraries or clearing houses.' And one film 'serves in many theaters from day to day until it is worn out.' "

In the instant case, films are shipped from Massachusetts and New York into Connecticut to exhibitors in that state, and, after the expiration of the exhibition period agreed upon, are shipped back by the exhibitor, by express or parcel post, to Boston or New York as the case may be and, if the Ohio statute did not constitute a restraint on interstate commerce, it is difficult to maintain that the Connecticut statute is void on the same ground that was unsuccessfully urged upon the court in the Ohio case.

In Robbins v. Shelby County Taxing District, 120 U. S. 489, 493, 7 S. Ct. 592, 594 (30 L. Ed. 694), Mr. Justice Bradley, discussing commerce between the states, said: "It is also an established principle, as already indicated, that the only way in which commerce between the states can be legitimately affected by state laws, is when, by virtue of its police power, and its jurisdiction over persons and property within its limits, a state provides for the security of the lives, limbs, health, and comfort of persons and the protection of property; or when it does those things which may otherwise incidentally affect commerce, such as the establishment and regulation of highways, canals, railroads, wharves, ferries, and other commercial facilities; the passage of inspection laws to secure the due quality and measure of products and commodities; the passage of laws to regulate or restrict the sale of articles deemed injurious to the

health or morals of the community; the imposition of taxes upon persons residing within the state or belonging to its population, and upon avocations and employments pursued therein, not directly connected with foreign or interstate commerce or with some other employment or business exercised under authority of the Constitution and laws of the United States; and the imposition of taxes upon all property within the state, mingled with and forming part of the great mass of property therein. But in making such internal regulations a state cannot impose taxes upon persons passing through the state, or coming into it merely for a temporary purpose, especially if connected with interstate or foreign commerce; nor can it impose such taxes upon property imported into the state from abroad, or from another state, and not yet become part of the common mass of property therein; and no discrimination can be made, by any such regulations, adversely to the persons or property of other states; and no regulations can be made directly affecting interstate commerce. Any taxation or regulation of the latter character would be an unauthorized interference with the power given to Congress over the subject."

He added: "Interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce, or that which is carried on solely within the state."

The court in that case held that a Tennessee statute was void which enacted that all drummers and all persons not having a regular licensed house of business in the taxing district of Shelby county, offering for sale, or selling goods, wares, or merchandise therein by sample, should be required to pay $10 per week or $25 per month for such privilege.

It must be admitted that, if Connecticut had exacted a license fee from the agents sent by the plaintiffs into the state to solicit contracts with exhibitors in that state for the exhibition of their photoplays, exaction would be invalid. It would be a direct burden upon interstate commerce, which the state clearly could not impose. Ozark Pipe Line Corporation v. Monier, 266 U. S. 555, 45 S. Ct. 184, 69 L. Ed. 439; Texas Transport & Terminal Co. v. City of New Orleans, 264 U. S. 150, 152, 153, 44 S. Ct. 242, 68 L. Ed. 611, 34 A. L. R. 907; Rearick v. Pennsylvania, 203 U. S. 507, 27 S. Ct. 159, 51 L. Ed. 295; Stockard v. Morgan, 185 U. S. 27, 22 S. Ct. 576, 46 L. Ed. 785; Caldwell v. North Carolina, 187 U. S. 622, 632, 23

S. Ct. 229, 47 L. Ed. 336; Asher v. Texas, 128 U. S. 129, 9 S. Ct. 1, 32 L. Ed. 368. But Connecticut has not attempted any such thing.

Whether the statute be regarded as a revenue measure, a police regulation, or both, we regard it as constitutional. It does not prohibit the bringing of moving picture films into Connecticut, and it only incidentally affects commerce between the states.

Licenses are used for purposes of taxation, regulation, or prohibition. 2 Cooley on Taxation (3d Ed.) 1133. Whether in a particular case they are resorted to in the exercise of the taxing or the police power of the state depends upon the dominant purpose of the Legislature in enacting the law. State v. Murphy, 90 Conn. 662, 665, 98 A. 343. In the License Tax Cases, 5 Wall. 462, 18 L. Ed. 497, it is made very clear that a license may be a mere form of imposing a tax. But we think an examination of the statute herein involved shows that the "tax" imposed is not an exercise of the taxing power of the state of Connecticut, but is an exercise of the police power of the state.

[16] But we are told that the censorship provisions in the act go beyond anything as yet upheld by the courts, vest arbitrary and uncontrolled power in the commissioner, and are void under the Fourteenth Amendment of the United States.

Does the statute invest the commissioner with arbitrary power? Does it fail to establish a standard by which his duty or discretion is defined? Is his power to revoke registration and to cancel the permit unlimited?

The act does not require either registration of the film or the payment of a tax in all cases, but only in certain specified cases. The provisions of the act in section 2 declare that the act shall not be construed to require registration or payment of a tax on certain specified reels—reels which portray current events, or those of a strictly scientific character and intended for the use of the learned professions, and reels for the promotion of educational, charitable, religious, and patriotic purposes, and for the instruction of employees by the employers of labor. On application made to the commissioner, he is to issue permits for the delivery of such films without the payment of any tax. Then it is provided that "any permit so granted may be canceled within the discretion of the commissioner, and, in case of such cancellation, the tax due thereon shall be paid by the exhibitor." The meaning of

this provision seems perfectly clear. It is that, if a permit is issued without the payment of the tax, and upon the understanding that the particular film is of the class exempt from the tax, and the commissioner ascertains later that it is not within the exempt class, he may cancel the permit, and then the tax due thereon is to be paid by the exhibitor. This does not clothe the commissioner with arbitrary power. One is clothed with arbitrary power only when the law invests him with power to act according to his own will or pleasure, capriciously, and without adequate determining principle. The act involved herein does not permit such action, but adequately indicates the determining principle by which his action is to be controlled.

The use of the words "within the discretion of the commission" does not import absolute and capricious discretion. It is an administrative discretion, and it requires him to satisfy himself that such a state of facts exists that under the statute a reel is of "strictly scientific character" or is "for the promotion of educational, charitable, religious, and patriotic purposes and for the instruction of employees by employers of labor." In deciding that question, he necessarily exercises discretion and judgment. It can be decided in no other way. And in doing so he does not have unlimited license to act, irrespective of restraint. He must act in conformity with the intent and provisions of the statute.

Discretion is defined in the Standard Dictionary as follows: "(3) Law. The act or the liberty of deciding according to the principles of justice and one's ideas of what is right and proper under the circumstances, without willfulness or favor."

The discretion given to the commissioner only relates to the execution of the act which is complete in all its parts. The act is specific as to the kind of reels which must be registered and upon which a tax must be paid. Whether a film belongs or not to the class of films which must be registered, and must pay the tax, is a question of fact. The function of the commissioner is limited to determining whether a film comes within the class that must be registered and must pay the tax. In determining that question, he must of course exercise his discretion or his judgment. It would seem that a Legislature may consistently with the federal Constitution delegate to an administrative officer or officers the determination of such a question. Douglas v. Noble, 261 U. S. 165, 43 S. Ct. 303, 67 L. Ed. 590; Reetz v. Michigan, 188

U. S. 505, 23 S. Ct. 390, 47 L. Ed. 563. The facts in this case have no analogy to those in Yick Wo v. Hopkins, 118 U. S. 356, 6 S. Ct. 1064, 30 L. Ed. 220.

In Red C. Oil Mfg. Co. v. Board of Agriculture of North Carolina, 222 U. S. 380, 32 S. Ct. 152, 56 L. Ed. 240, the state of North Carolina had passed an act for the inspection of illuminating oils sold or offered for sale in the state. The legislative requirement was that the illuminating oils furnished in the state should be safe, pure, and afford a satisfactory light, and it gave to the board of agriculture the power to determine what oils measured up to those standards. The Supreme Court sustained the validity of the act. If that statute established "a sufficient primary standard," it is difficult to perceive why the Connecticut statute does not do the same, and why the tax commissioner of Connecticut is not legally as competent to determine whether the films measure up to the classification and standards prescribed as was the board of agriculture of the state of North Carolina.

[17] If, however, we are mistaken in thinking the above portion of the act valid, it would not impair the rest of the act. For the law is well established that any independent provision may be eliminated if that which is left is fully operative as a law, unless it appears from a consideration of the sections that the Legislature would not have enacted that which is within independently of that beyond its power. Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 365, 14 S. Ct. 1047, 38 L. Ed. 1014. If the above provision should be held void the remaining provisions being valid could stand and be executed. Loeb v. Columbia Township Trustees, 179 U. S. 472, 489, 21 S. Ct. 174, 45 L. Ed. 280, and see El Paso & N. E. R. Co. v. Gutierrez, 215 U. S. 87, 30 S. Ct. 21, 54 L. Ed. 106.

[18] The act contains one other provision on this subject which must be considered. It states: "In the event that any film shall have been registered which the commissioner may find to be immoral or of a character to offend the racial or religious sensibilities of any element of society, he may revoke such registration by notice in writing to any exhibitor, and in case of such revocation the amount of tax paid thereon shall be forfeited to the state."

Under this provision the commissioner certainly is not clothed with arbitrary power. His authority to revoke exists only if the film is immoral or of a character to offend the "racial or religious sensibilities of any

element of society," and not otherwise. If the commissioner, acting under either provision of section 2, abuses his discretion, and acts in an arbitrary and capricious manner, and contrary to the plain intent of the statute, there remains the right to appeal to the courts which exists under the general principles of jurisprudence. As was said in Bradley v. Richmond, 227 U. S. 477, 483, 33 S. Ct. 318, 320 (57 L. Ed. 603), "there would, under general principles of jurisprudence, remain the right to judicial review if the result should violate either a right secured under the law of the state or that of the United States."

[19] In our opinion the statute does not invest the commissioner with arbitrary power. But, if we were of the contrary opinion, and thought that the discretion with which the commissioner is invested under the provision authorizing the cancellation of permits issued for the exhibition of scientific, educational, charitable, religious, and patriotic films, did invest him with arbitrary power, we do not think the plaintiffs herein are in a position to raise the question in these suits. There is no allegation in the bills that permits have been issued to plaintiffs for the exhibition of films of the class above mentioned, which permits the commissioner has canceled or is now threatening to cancel in the exercise of the discretion with which he is invested. And there is not even an allegation that plaintiffs have produced or have in their possession films of the class above described, and which they desire to bring into the state of Connecticut. As the plaintiffs do not show that they are in any wise affected by the provision cited, the objection raised as to its unconstitutionality is really not before the court and would not ordinarily now be determined. Chicago Board of Trade v. Olsen, 262 U. S. 1, 42, 43 S. Ct. 470, 67 L. Ed. 839. A party who asks the court to declare a statute unconstitutional "must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as the result of its enforcement. * * *" Massachusetts v. Mellon, 262 U. S. 447, 488, 43 S. Ct. 597, 601 (67 L. Ed. 1078). The constitutionality of a statute is usually not determined unless its determination is absolutely necessary to dispose of the merits of the case, and, if that part of the statute alleged to be unconstitutional does not affect the rights of the complaining party, the question of constitutionality is not decided. Flint v. Stone

Tracy Co., 220 U. S. 108, 177, 31 S. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312. The plaintiffs are not in court complaining that they have been injured by the revocation of any registration, or the confiscation of any sum paid for registration; neither is the threat of any such action alleged.

For the reasons stated, the prayers of the bill that an injunction issue restraining the defendants from enforcing or attempting to enforce the statute of Connecticut enacted in 1925, "providing for the imposition of a tax on films from which motion pictures are to be exhibited within the state," is denied in each case, and the bills are dismissed.