**MAJESTIC THEATRE CO., Inc., v. UNITED ARTISTS CORPORATION et al.**

No. 3259.

District Court, D. Connecticut.

Oct. 9, 1930.

Robert P. Butler and Robinson, Robinson & Cole, all of Hartford, Conn. (Francis W. Cole and Thomas Hewes, both of Hartford, Conn., of counsel); for plaintiff.

Cadwalader, Wickersham &. Taft, of New York City (F. Sims McGrath, Arthur L. Fisk, Jr., and Catherine Noyes Lee, all of New York City, of counsel), for defendants United Artists Corporation, Fox Film Corporation, and New Haven Film Board of Trade.

Solomon Elsner, of Hartford, Conn. (Harry L. Nair, of Hartford, Conn., of counsel), for Vitagraph, Inc.

BURROWS, District Judge.

This is an action at law, alleging a conspiracy in violation of the anti-trust laws resulting in injury to the plaintiff. The defendants, in addition to filing answers admitting or denying particular allegations of the complaint, pleaded a special defense, identical in form as to each of the defendants, by way of confession and avoidance. To this defense plaintiff demurred, and the matter is before the court on this demurrer.

One of the principal claims made by the defendants, both in argument and brief, is that the complaint does not set out a good cause of action, claiming, among other things, that the defendants were not engaged in interstate commerce; that it did not appear that the combination controlled the film business; and that the contracts under which the defendant distributors acted were voluntarily entered into by the plaintiff, and therefore the conduct complained of was damnum absque injuria. The defendants contend that they may attack the complaint through the plaintiff's demurrer to their special defense on the authority of Bishop v. Quintard, 18 Conn. 395, which held as an established rule of pleading that a demurrer searched the entire record. But it is very doubtful if that rule is now sanctioned in Connecticut, since the statutory requirement is that a demurrer must be special, and specifically set forth reasons why the pleading in question is insufficient. Schroeder v. Tomlinson, 70 Conn. 348, 351, 39 A. 484. The rules under the Practice Act of Connecticut provide that the demurrer is the only remedy before trial by which to test the sufficiency of a cause of action. Connecticut Practice Book 1922, p. 287, § 196. If a defendant deems a complaint to be insufficient, the proper procedure provided by the rules is to demur. It is the present practice in this state. Also, if the complaint is not specific in its allegations, the remedy is by motion. Connecticut Practice Book 1922, p. 295, § 223. Rules of pleading in this court conform to rules of pleading under the Connecticut Practice Act. See District Court Rule 8. Inasmuch, however, as the parties have, both orally and in brief, argued the demurrer to the special defense with the allegations of the complaint as a basis, I will assume for the moment that it is proper to examine the complaint to determine whether or not there is alleged a cause of action under the anti-trust laws.

An examination of the complaint reveals that in February, 1926, the leading distributors of moving pictures in the United States, including the defendants, adopted and agreed to use a so-called "Standard Exhibition Contract," and from then until May, 1928, i. e., the date of the writ, were unwilling to contract with exhibitors for licensing pictures except in this form. Paragraph 20, the only

relevant section of this contract, relates to arbitration, and this is set out in full in a note below.[1]

It expressly provides that this paragraph shall be construed according to the laws of New York. The substance of this paragraph is that each party agrees to submit any controversy under said contract to the board of arbitration located in the city where the Distributors' Exchange is maintained. They agree to abide by the award and accept as final any finding of facts. If an exhibitor refuses to submit to arbitration or abide by an award under the contract with the particular distributor or under a contract with any other distributor, or if the board finds a breach of contract which in its opinion justifies the demand of security by the particular distributor, or any other distributor, in dealing with the exhibitor, then the distributor may require the payment of an additional sum, not to exceed $500 under each existing

---

[1] Paragraph 20 of the Standard Exhibition Contract: The parties hereto agree that before either of them shall resort to any court to determine, enforce or protect the legal rights of either hereunder, each shall submit to the Board of Arbitration (established or constituted pursuant to rules and regulations now on file in the office of the Motion Picture Producers and Distributors of America, Inc., bearing date March 1, 1926, and identified by the signature of its President, a copy of which will be furnished to the Exhibitor upon request) in the city wherein is situated the Exchange of the Distributor from which the Exhibitor is served or if there be no such Board of Arbitration in such city then to the Board of Arbitration in the city nearest thereto (unless the parties hereto agree in writing that such submission shall be made to a Board of Arbitration located in another specified city), all claims and controversies arising hereunder for determination pursuant to the rules of procedure and practice adopted by such Board of Arbitration.

The parties hereto further agree to abide by and forthwith comply with any decision and award of such Board of Arbitration in any such arbitration proceeding, and agree and consent that any such decision or award shall be enforceable in or by any court of competent jurisdiction pursuant to the laws of such jurisdiction now or hereafter in force; and each party hereto hereby waives the right of trial by jury upon any issue arising under this contract, and agrees to accept as conclusive the findings of fact made by any such Board of Arbitration, and consents to the introduction of such findings in evidence in any judicial proceeding.

In the event that the Exhibitor shall fail or refuse to consent to submit to arbitration any claim or controversy arising under this or any other film service contract providing for arbitration which the Exhibitor may have with the Distributor or any other distributor or to abide by and forthwith comply with any decision or award of such Board of Arbitration upon any such claim or controversy so submitted, or if the Exhibitor shall be found by such Board of Arbitration in any such arbitration proceeding to have been guilty of such a breach of contract as shall in the opinion of such Board of Arbitration justify the Distributor or any other distributor in requiring security in dealing with the Exhibitor, the Distributor may, at its option, demand, for its protection and as security for the performance by the Exhibitor of this and all other existing contracts between the parties hereto, payment by the Exhibitor of an additional sum not exceeding $500 under each existing contract, such sum to be retained by the Distributor until the complete performance of all such contracts and then applied, at the option of the Distributor, against any sums finally due or against any damages determined by said Board of Arbitration to be due to the Distributor, the balance, if any, to be returned to the Exhibitor, and in the event of the Exhibitor's failure to pay such additional sum within seven (7) days after demand the Distributor may by written notice to the Exhibitor suspend service hereunder until said sum shall be paid and/or terminate this contract.

In the event that the Distributor shall fail or refuse to consent to the submission to arbitration of any claim or controversy arising under this or any other film service contract providing for arbitration which the Distributor may have with the Exhibitor, or to abide by and forthwith comply with any decision or award of such Board of Arbitration upon any such claim or controversy so submitted, or if the Distributor shall be found by such Board of Arbitration in any such arbitration proceeding to have been guilty of such a breach of contract as shall in the opinion of such Board of Arbitration justify the Exhibitor in refusing to deal with the Distributor, the Exhibitor may at his option terminate this and any other existing contract between the Exhibitor and the Distributor by mailing notice by registered mail within two (2) weeks after such failure, refusal or finding, and in addition the Distributor shall not be entitled to redress from such Board of Arbitration upon any claim or claims against any exhibitor until the Distributor shall have complied with such decision, and in the meanwhile the provisions of the first paragraph of this Article Twentieth shall not apply to any such claim or claims.

Any such termination by either party, however, shall be without prejudice to any other right or remedy which the party so terminating may have by reason of any such breach of contract by the other party.

The provisions of this contract relating to arbitration shall be construed according to the law of the State of New York.

contract, to be retained by the distributor until all contracts are completed. At this point, it is to be observed that each contract between an exhibitor and a distributor gathers within its effect not only the immediate distributor, but all other distributors having similar contracts and apparently distributors having no contracts; that is, all distributors who are parties to the combination and with whom it may be necessary for a particular exhibitor to deal.

The distributors in the United States carrying on business in Connecticut maintain, through their branch offices or exchanges, the New Haven Film Board of Trade, one of the defendants herein, which covers in its operations the entire state. An exhibitor in Connecticut is unable to secure sufficient films without dealing with one or more members of this board, that is, the plaintiff or any other exhibitor in Connecticut cannot go into an open film market, but must deal, if at all, with the distributors of films according to the organization created by them acting in combination. This organization apparently contemplates national distribution through state-wide exchanges. If films are wanted for showing in Connecticut, they must be procured in Connecticut from members of the defendant Film Board of Trade. The defendant Film Board of Trade in 1926 duly created a board of arbitration under the standard exhibition contract, which proceeded to hear disputes, make awards, and fix the sum which might be demanded by a distributor in dealing with an exhibitor. Its decisions were duly transmitted to the secretary of the Film Board, and he in turn would notify each member thereof, including the defendants. It is apparent, therefore, that substantially all the distributors doing business in Connecticut, and with whom an exhibitor must deal, were members of the combination, who were willing to contract in the standard form, or not at all, with its provisions for arbitration, and who, in pursuance of contracts with a particular exhibitor, might demand security, or apparently might demand security even though they had no contract, if notified of the appropriateness of so doing by the board of arbitration. In fact, it is alleged in the complaint (paragraph 30) that all of the members of the Film Board— that is, substantially all distributors of films in Connecticut—were parties to the combination to insist upon such contract with its arbitration features and this is also the only permissible inference. Eastern States Retail Lumber Dealers' Ass'n v. U. S., 234 U. S.

600, 612, 34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788.

Prior to April 18, 1927, one A. C. Morrison owned and operated the Majestic Theatre in Hartford. Mr. Morrison had a contract with Tiffany Productions, Inc., to exhibit certain of its pictures at said theatre. Tiffany was a member of the defendant Film Board of Trade, and by necessary inference of the alleged combination. On or about April 18, 1927, Morrison leased said theatre to the plaintiff corporation, which continued to operate it until October, 1927, when the theatre closed and did not reopen. Shortly before June 5, 1927, Morrison had a dispute with Tiffany, and Tiffany refused to forward any more pictures for exhibition at the theatre. The plaintiff corporation then made contracts in the standard form for future showing of films with the defendant distributors beginning in September, 1927. These contracts provided for a sufficient number of films to keep the theatre in operation throughout the following year. The defendant distributors were all corporations of states other than Connecticut, engaged in the business of producing and distributing pictures throughout the United States, and duly admitted to Connecticut and maintaining branch offices in New Haven. Plaintiff, however, was compelled to close its theatre during the summer of 1927 because it was unable to get any pictures at all from any distributor in Connecticut because of the dispute between Morrison, the individual, and Tiffany; that is, no member of the combination would deal at all with the plaintiff. Tiffany later referred the dispute to the board of arbitration at New Haven, and the board in September or October of that year notified the secretary of the Film Board of its award against Morrison, the individual, and in turn the secretary notified the defendant distributors, and presumably all other members in accordance with the practice hereinbefore described. The defendant distributors then notified the plaintiff that unless $500 was deposited under each contract with them, service would be suspended. Plaintiff corporation declined to make any deposit, and service was terminated. Said Morrison, president of the plaintiff corporation, then offered to defendant distributors payment in advance in cash for the films booked for immediate showing. This was refused. Although the plaintiff's financial standing was not in question, defendant distributors declined to furnish pictures under their contracts unless the $500 deposit was made, because of the claimed de-

fault of Morrison personally with Tiffany; plaintiff was also unable to secure pictures from any other distributor member of said Film Board, except upon making a $500 deposit, on the ground that the plaintiff was in default. It is further alleged that this course of conduct was engaged in by the defendants and all other distributors in the United States doing business in Connecticut, for the purpose of forcing plaintiff and any other exhibitor in Connecticut to agree to arbitration in accordance with the terms of the standard contract; that as a result of this combination and the refusal of the plaintiff to make the deposits required, it was unable to get films and was compelled to close its theatre and has thereby suffered great damage.

■ Without further comment upon the allegations of the complaint and without considering the effect of the allegations of the special defense, I will state that I am of the opinion that a good cause of action has been alleged with sufficient particularity.

■ The claim that the defendants are not engaged in interstate commerce is without merit in view of the decisions in Binderup v. Pathé Exchange, Inc., 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308; Fox Film Corp. v. Trumbull (D. C.) 7 F.(2d) 715; U. S. v. Paramount Famous Lasky Corporation (D. C.) 34 F. (2d) 984. Whether or not the contracts were voluntarily entered into will be discussed subsequently, but I will here state that these contracts were not voluntarily entered into by the plaintiff. Assuming that they were, the claim of immunity based upon such contracts is not a complete defense, as it in no way relates to the members of the combination who, having no contract, refused to do business except upon condition of making a deposit, and for which conduct the defendants as members of the conspiracy are liable. It is likewise clear that the claim that the combination, including the defendants, did not completely control the film market open to the plaintiff is without support on the allegations of the complaint.

■ The existence of a combination, its object, and the means selected to achieve that object being clearly set forth, the essential question as to the complaint is whether the combination is in violation of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15). The object of the combination, so far as Connecticut is concerned, is to compel all exhibitors to submit to arbitration, and obey awards. The agreement to submit is effected through an unwillingness to contract on any other basis, and as an exhibitor must accept this contract or secure no films, it is in reality a condition imposed upon his access to the market. It is a substantial impairment of his right to freely engage in interstate commerce and is unreasonable. The object of the combination is therefore unlawful. Wolff Co. v. Court of Industrial Relations of State of Kansas, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280; U. S. v. Paramount, etc., supra.

I am further of the opinion that the means selected to accomplish this object are unlawful. If there had been a concerted refusal to deal altogether for the purpose of forcing the plaintiff or said Morrison to settle his dispute with Tiffany Company, the answer would be certain. Loewe v. Lawlor, 208 U. S. 274, 28 S. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Eastern States Retail Lumber Dealers' Ass'n v. U. S., supra. It appears that this did happen in the summer of 1927. Does the requirement of a deposit as a condition of doing business, instead of complete refusal, where the plaintiff's credit is not in doubt, produce a different legal result? Clearly the question is one of degree. But I think the exacting of an extra payment of this size as a condition of doing interstate business for the purpose of imposing the will of a combination on a citizen is prohibited by law. Thomsen v. Cayser, 243 U. S. 66, 37 S. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322.

[8] Having determined that the complaint sets forth a good cause of action, does the special defense nevertheless offer a valid excuse? For the purpose of determining that question, the traversable allegations of the complaint are deemed to be admitted. Will's Gould on Pleading (6th Ed.). p. 510 et seq.

■ The substance of this defense is that the plaintiff corporation has no reality aside from Morrison; that Morrison owns all the stock, and is in control of its operations and contracts; that its credit and business reputation was entirely dependent upon Morrison; and that Morrison treated it as his enterprise, agent, and alter ego. Further, that Morrison, prior to the incorporation of the plaintiff, was familiar with the film industry, knew all about the standard exhibition contract, formed the plaintiff corporation for the express purpose of entering into such contracts with the provisions for arbitration, and actually caused it to enter into such contracts; that with respect to the contracts made between plaintiff and the defendant distributors, they were in the standard form, and that all of the acts of the defendants complained of

were strictly in accordance with the terms of the contract; and that therefore the plaintiff has no remedy.

To make these contracts with the plaintiff the foundation of a defense as alleged, it is, of course, necessary to disregard the corporate entity of the plaintiff and consider it identical with Morrison, so that the grievance against Morrison can be treated as a grievance against the corporation. It is to be observed that, aside from alleging that the credit and business reputation of the plaintiff depended upon that of Morrison, nothing whatever appears to throw doubt on the credit or reputation of either the plaintiff or Morrison. The fact that a contract with Tiffany was largely unperformed and that an award was entered against Morrison certainly does not support any claim of fraud, or the use of the plaintiff as a means of avoiding any contractual obligation. There is no allegation, for example, that Morrison individually was not financially responsible, or that the theatre was his only asset, or that the plaintiff was formed to enable Morrison to evade any obligation. It is alleged in the complaint, and not denied in the special defense, that the financial responsibility of the plaintiff was not open to question, and that cash was tendered the defendant distributors for the pictures contracted for, for immediate showing.

However, in spite of this absence of any alleged facts which would be relevant, the defendants urged at length in argument that the plaintiff was a shield to enable Morrison to default on his contract with Tiffany; that the lease of the theatre to the plaintiff was fraudulent; and that the whole behavior of the distributors in Connecticut was in defense of sound credit and that, therefore, the combination came within the decision of Judge Thacher in U. S. v. First National Pictures (D. C.) 34 F.(2d) 815.

I am of the opinion that the facts of this case do not bring it within the First National Pictures Case in any way, nor within the doctrine of the so-called credit cases. Maple Flooring Manufacturers' Ass'n v. U. S., 268 U. S. 563, 45 S. Ct. 578, 592, 69 L. Ed. 1093; U. S. v. Fur Dressers' & Fur Dyers' Ass'n (D. C.) 5 F.(2d) 869.

I am further of the opinion that on the allegations of the complaint and special defense a situation is not presented for the application of the principle that the corporate veil may be pierced. Continental Tyre & Rubber Co. v. Daimler, [1915] 1 Q. B. 893; Donnell v. Herring-Hall-Marvin Safe Co., 208 U. S. 267, 28 S. Ct. 288, 52 L. Ed. 481;

Pierce v. National Bank of Commerce (C. C. A.) 13 F.(2d) 40.

This being so, manifestly the defense is inadequate in an action by the plaintiff who, so far as the pleadings show, was a stranger to the controversy between Morrison, individually, and Tiffany.

■ Even assuming, however, that for the purpose of this demurrer Morrison and the plaintiff are one, the special plea is inadequate in that it offers no defense whatever for the acts of the other members of the alleged conspiracy in Connecticut, who had no contracts with the plaintiff or Morrison. Their refusal to deal except on condition of making the deposit was manifestly a part of the general conspiracy, and for these acts the members selected for suit are liable. Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 249, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461.

The really important element in the defense, so far as these defendants are concerned, and in fact so far as the distributors in general are concerned, is the claim of the validity of the acts under and in accordance with the terms of the standard exhibition contract. For, assuming that Morrison and the plaintiff are identical, the question is whether the defendants were justified as a matter of law in their conduct simply because it was strictly in accordance with the standard contract.

■ Of course, in order to reach this point in the defense, it must be assumed that the object of the combination, alleged and admitted, was lawful. I have already held that the object was unlawful, and, such being the case, the acts of the defendants, no matter how innocent, become unlawful. I will proceed, nevertheless, to consider this claim because of its importance to the defendants.

The reasoning of the defendants is that if the plaintiff, with full knowledge of the conditions of the industry, voluntarily, with its eyes open, enters into contracts which provide for certain behavior under certain conditions, then, if such behavior ensues in strict accordance with the contracts, the plaintiff cannot complain. The weakness in this defense is that the contract on the plaintiff's part is not voluntary. As Judge Thacher said in U. S. v. Paramount, etc., supra, at page 989 of 34 F.(2d):

"In fairness it cannot be said that the restraint imposed upon these exhibitors is voluntary because they accept and agree to be bound by the contracts. They can have none

other, because the defendants have agreed that they shall not; and, unless something more than the mere acceptance of all they can get is shown, they must be said to have acted under an involuntary restraint, imposed and continued by the defendants to the end that the contracts shall be signed and their terms obeyed. That such 'coercive restraint upon the commercial freedom of an exhibitor, who was neither represented nor consulted with reference to the agreement to adopt the standard form of contract, is undue and unreasonable, both at common law and under the Sherman Act [15 USCA §§ 1–7, 15], I cannot doubt. Gains resulting from such restraints to the industry as a whole do not in the eyes of the statute justify the vicarious sacrifice of the individual, even for the sake of bigger and better business."

▮ If an industry having an essential monopoly in a particular community could require persons wishing to engage in business to enter into a form of contract which might provide for any form of restraint of interstate commerce, the will of Congress as expressed in the anti-trust laws could be nullified. This is not the law and private contracts cannot be resorted to for that purpose. Addyston Pipe & Steel Co. v. U. S., 175 U. S. 211, 20 S. Ct. 96, 44 L. Ed. 136.

The matters set up in the special defense not being sufficient for the reasons herein set forth, the demurrer thereto is sustained.