## UNITED STATES v. PARAMOUNT FAMOUS LASKY CORPORATION et al.

District Court, S. D. New York. October 15, 1929.

Charles H. Tuttle, U. S. Atty., of New York City (C. Stanley Thompson and Ralstone R. Irvine, Sp. Assts. to Atty. Gen., of counsel), for petitioner.

Cadwalader, Wickershan & Taft, of New York City (Edwin P. Grosvenor, Arthur L. Fisk, Jr., and Gabriel L. Hess, all of New York City, of counsel), for defendants.

THACHER, District Judge (after stating the facts as above). This suit, although tried separately, is a companion case to United States of America v. First National Pictures, Inc., et al. (E. 45–99 D. C.) 34 F. (2d) 815, decided September 25, 1929, and reference may be had to the opinion in that case for a general description of the motion picture industry. The defendants named are 10 corporations engaged in the distribution of motion picture films to theater owners throughout the United States, the Motion Picture Producers & Distributors of America, Inc., a New York membership corporation having a "Class B" membership composed of the defendant distributors, and 32 film boards of trade maintained by the defendant distributors and other distributors of motion picture films in 32 principal cities of the United States. These boards of trade, whether incorporated or unincorporated, have a membership composed of the local exchange managers of the defendant distributors and of all, or practically all, other distributors of motion picture films in the territory in which the particular film board of trade conducts its operations.

The defendant distributors distribute, through their exchanges, approximately 60 per cent. of the motion picture films distributed annually in the United States, and the membership of each defendant film board of trade represents practically every distributor of motion picture films in the territory in which the board operates. The members

of the defendant film boards of trade distribute approximately 98 per cent. of the motion picture films distributed annually in the United States, and it is impossible for any motion picture theater to secure sufficient motion picture films for its regular operation without dealing with one or more members of the particular film board of trade in the territory in which said theater is located. For many years it has been the custom for each distributor of motion picture films in the United States to announce, in the spring of each year, its program of pictures which will be available for exhibition during the year, commencing early in the following fall. Immediately thereafter contracts are solicited from the owners of upwards of 25,000 motion picture theaters throughout the United States for the exhibition of these pictures. The business of solicitation is conducted by the branch managers and their salesmen, but the contracts are subject to approval and acceptance at the home office. As a rule the exhibitor contracts with the distributor for a group of pictures, varying in number from 20 to 60, to be made available for exhibition at regular intervals throughout the year. The contract is usually negotiated and concluded before most of the pictures have been produced, and long before they have been made available for distribution, and it is therefore necessary to make provision in the contract for the selection and designation of play dates as the films become available in the exchanges for distribution and exhibition. Since the agreement merely grants a license to exhibit, there are many other details which must be covered by the written agreement. The average theater exhibits less than 200 feature pictures during the course of the year, and 350 short subjects. No single distributor releases more than 75 feature pictures, while some release only 12 annually. It follows that the average exhibitor contracts in the course of the year with from 5 to 15 distributors, who actively compete for this business. While the average exhibitor signs from 25 to 50 contracts, many exhibitors sign more than 50 contracts in the course of a year.

Prior to 1922 the contracts of the various distributors contained many widely differing provisions, and much confusion resulted, particularly in connection with the selection of play dates under varying contracts with different distributors. There was much dissatisfaction both among the distributors and among the exhibitors. Shortly after the organization of the Motion Picture Producers & Distributors of America, Inc., which included in its membership all of the defendant distributors, negotiations were instituted between the defendant distributors and various exhibitors in an effort to agree upon a uniform exhibition contract, and since that time there has been in progress in this industry between the motion picture distributors and exhibitors a continuous process of collective bargaining with reference to the provisions of the uniform contract. The distributors, being comparatively few in number, were compactly organized and thoroughly represented in these negotiations. The thousands of individual theater owners scattered throughout the United States were not thus completely organized, and many of them were not represented in these negotiations, although it must in fairness be said that, in so far as the exhibitors were organized, they were represented through representatives selected by their organizations.

In the summer of 1922 the defendant distributors, the defendant association Motion Picture Producers & Distributors of America, Inc., and committees of representatives appointed by various exhibitor associations, appreciating the loss of time and money to the entire industry and the hardships of exhibitors resulting from the many dissimilarities in noncompetitive matters existing in the long and complicated contracts of the different distributors in the United States, and desirous of saving such loss of time and money in order to reduce the cost of distribution and exhibition of pictures in the United States, set about the preparation of a uniform or standard form of contract, the adoption of which would not in any manner diminish competition between distributors, but which would help to eliminate some of the confusion in the industry arising out of these dissimilarities in matters of detail in intricate contracts. With this purpose the defendant distributors, by committees and counsel, for many months conferred and negotiated with each other and with the committees and counsel of various exhibitors associations, national and state, and with individual exhibitors, in an effort to reach some form of contract which would be acceptable to distributors and exhibitors alike. The form of contract which is annexed to the petition as "Exhibit A" was finally arrived at as the form acceptable to more persons interested than any other form, and it was adopted and used by the defendant distributors and some other distributors, beginning with the spring of 1923.

In 1925 and early in 1926 similar con-

ferences were had between the distributors and representatives of exhibitor organizations and individual exhibitors, which resulted in the adoption, on February 6, 1926, of the first standard exhibition contract, which is annexed to the petition and marked "Exhibit B," and in an agreement upon rules and regulations relating to arbitration, referred to in clause twentieth of said contract; these rules and regulations being annexed to the petition and marked "Exhibit E." At the same time an exhibitors' advisory committee was chosen to consult with the distributors relative to still further improvements in the contract. The members of this advisory committee were the president of the Motion Picture Theater Owners of America, the president of the Theater Owners' Chamber of Commerce, the president of the Motion Picture Theater Owners of the Northwest, and E. V. Richards, an exhibitor operating a large number of theaters in the south and not a member of any exhibitors' organization. This committee continued negotiations with the distributors, and reached an agreement in May, 1926, with reference to certain changes in the standard exhibition contract.

In September, 1927, the Federal Trade Commission invited those engaged in producing, distributing, and exhibiting motion pictures in the United States to attend a trade practice conference in New York City for the purpose of participating in deliberations relating to the elimination from the industry of any unfair methods of competition which may have been practiced. At this conference a resolution was passed, with only one dissenting vote, expressing the desire of all branches of the industry that a uniform exhibition contract be used, declaring the arbitration of disputes arising out of the contract to be a fair trade practice, and directing the immediate designation of a committee of nine to institute a study of the provisions of the standard exhibition contract and the rules for arbitration provided for therein, and to develop improvements in such contract and in such rules for arbitration; the contract and rules to be ready for use for the season of 1928–1929. After consideration by the Federal Trade Commission this resolution was approved by the Commission on May 25, 1928. Pursuant to this resolution the contract committee was appointed before the close of the conference, three members chosen by the unaffiliated exhibitor delegates (that is to say, delegates representing exhibitors not in any way affiliated with the distributors), three by the distributor delegates, and three by the affiliated exhibitor delegates; the latter three members of the committee being without right to vote by direction of the resolution. This committee, after protracted conferences and consideration of the contract and rules for arbitration, agreed upon the standard exhibition contract which is annexed to the petition as "Exhibit C" and upon the rules of arbitration dated May 1, 1928, which are annexed to the petition as "Exhibit G."

That the defendant distributors, together with other distributors, organized the film boards of trade, and caused these boards to adopt by-laws relating to arbitration (a copy of which is annexed to the petition marked "Exhibit D"), the rules and regulations relating to arbitration bearing date March 1, 1926, specified in the standard exhibition contract (a copy of which is annexed to the petition marked "Exhibit E") and the rules and regulations relating to arbitration specified in the standard exhibition contract, and dated December 1, 1926 (a copy of which is attached to the petition marked "Exhibit F") and the rules of arbitration specified in the standard exhibition contract filed with the American Arbitration Association, dated May 1, 1928 (a copy of which is attached to the petition marked "Exhibit G"), and that the Film Boards of Trade operated in accordance with these various contracts and rules, is admitted.

In the standard exhibition contract of May 1, 1928, the provisions with respect to arbitration were, in substance, as follows: The parties agree that before either of them shall resort to any court to determine, enforce, or protect the legal rights of either, each shall submit to the board of arbitration established and constituted pursuant to the rules of arbitration, in the city wherein is situated the exchange of the distributor from which the exhibitor is served, or, if there be no such board of arbitration in such city, then to the board of arbitration in the city nearest thereto, all claims and controversies arising under the contract for determination pursuant to the rules of arbitration and the rules of procedure and practice adopted by the board of arbitration. The parties further agree to abide by and forthwith comply with any decision and award in any such arbitration proceeding, and agree and consent that any such decision or award shall be enforceable in or by any court of competent jurisdiction pursuant to the laws of such jurisdiction now or hereafter in force. Each party waives the right of trial by jury upon any issue arising under the contract, and

agrees to accept as conclusive the findings of fact made by the board of arbitration, and consents to the introduction of such findings in evidence in any judicial proceeding. If the exhibitor fails or refuses to consent to submit to arbitration any claim or controversy arising under the contract, or under any other standard exhibition contract which he may have with the distributor, or with any other distributor, or abide by and forthwith comply with any decision or award of the board of arbitration upon any such claim or controversy so submitted, the distributor may, at its option, demand for its protection, and as security for the performance by the exhibitor of the contract and of all other existing contracts between the parties, payment by the exhibitor of an additional sum not exceeding $500 under each existing contract; such sum to be retained by the distributor until the complete performance of all such contracts and then applied, at the option of the distributor, against any sums finally due or against any damages determined by said board of arbitration to be due to the distributor, the balance if any, to be returned to the exhibitor. In the event of the exhibitor's failure to pay such additional sum within 7 days after demand, the distributor may by written notice to the exhibitor suspend service under the contract until said sum shall be paid and/or termination of the contract.

It will be noted that the effect of these provisions is that, if an exhibitor fails or refuses to submit to arbitration any claim or controversy arising under any contract with any distributor, then the right of every distributor to demand security upon every contract immediately arises, and, if the demand is not complied with within 7 days, all pending contracts with every distributor may be canceled. In view of the exhibitor's necessity to contract in advance with several distributors for the delivery of films to be exhibited in accordance with a program laid out for more than a year in advance, it will at once be seen that the exhibitor's refusal to arbitrate will immediately subject him to heavy demands for security, which, if not complied with, will result in the termination of his entire supply of films for exhibition in his theater, and probably result in conditions under which he cannot continue in business. It is alleged in the petition that the members of the film boards of trade have gone beyond the requirements of the contracts and the arbitration rules and have entered into supplemental understandings and agreements, without the knowledge and

against the general instructions of the defendant distributors and of the defendant association, to refuse to contract for the future exhibition of any motion picture films with any exhibitor who has failed to comply with any decision of any board of arbitration. The proofs abundantly establish the fact that this was the consistent practice of many of the film boards of trade until quite recently, when their attention was called to the fact that such action was not justified by the rules. When this was done the members of the film boards of trade were told that the question whether distributors would deal with any exhibitor who had refused to arbitrate or had failed to comply with an award was one for the decision of individual distributors; but at the same time it was stated that it had been the consistent policy of the distributors to refuse to deal with exhibitors who failed to arbitrate or to comply with arbitration awards. The coercive effect of this situation has undoubtedly been that, unless exhibitors submitted to arbitration and complied with the awards rendered against them, they have been unable to enter into new contracts and have been required to suspend service in their theaters unless able and willing to comply with the arbitration awards rendered against them or to deposit security under all of their outstanding contracts.

The rules of arbitration referred to in this contract provided that the board of arbitration shall consist of six persons, three of whom shall be members of the film board of trade, called distributor's representatives, and three of whom shall be proprietors or managers of theaters in the territory where the film board of trade is located, called exhibitor's representatives, provided, however, that in no event shall such exhibitor's representatives be managers of theaters owned or controlled by producers or distributors. The distributor's representatives are appointed by the members of the film boards of trade; the exhibitor's representatives by the local exhibitors' association; and if there be no local exhibitors' association, or if such association fails to appoint, then the president of the local chamber of commerce, upon request of the president of the film board of trade, or, if the president of the chamber of commerce fails to appoint, then the mayor or other chief executive of such city, appoints the exhibitor's representatives. Failing all this, the exhibitor's representatives are appointed by the president of the American Arbitration Association from among exhibitors operating theaters in the territory wherein the board of arbitration is located. In case

of a tie a majority of the members of the board of arbitration appoint a seventh arbitrator, or, if unable to agree, the secretary of the board requests the president of the chamber of commerce, or, if there be none, then the mayor or other chief executive of the city, to appoint a seventh arbitrator, who shall be neither a distributor nor an exhibitor, nor interested in the motion picture business. The board of arbitration has power to determine the dispute or controversy, to make findings, to direct what shall be done by either or both parties with respect to the matter in dispute, and to fix the maximum amount, not exceeding $500, which each distributor may demand as security pursuant to the arbitration clause. The findings, determination, and direction of the board are made conclusive and binding upon the parties. There are various rules of practice and procedure, and in addition rules for the enforcement of decisions of the board, which are, in substance, as follows: The secretary of the board of arbitration is required from time to time to notify in writing the secretary of the film board of trade located in each city out of which the exhibitor is served, of the name and address of each exhibitor who has been found by such board of arbitration to have refused to submit to arbitration a controversy arising under a contract containing the arbitration clause, or to have refused to comply with the decision of such board of arbitration; and in this connection the maximum amount (not exceeding $500) which each distributor may demand as security under each existing contract. Upon receipt of such information the secretary of the film board of trade is required thereupon to pass the same information along to all members of his film board of trade, and, upon receipt thereof, each member having a contract or representing a distributor having a contract containing the arbitration clause with any such exhibitor is required to demand payment by such exhibitor of such sum as in the judgment of such member or distributor shall be sufficient to protect such member or distributor in the performance of each contract with such exhibitor. It is provided that said sum shall not exceed the actual value of any print thereafter to be delivered under each such contract, plus the rental contracted to be paid therefor, and in no case shall exceed the maximum amount fixed by the board of arbitration. If the exhibitor fails to comply with any such demand, the distributor is required, under the rules, upon the expiration of 7 days, to suspend service under each

of its contracts with the exhibitor until such exhibitor shall have furnished the security demanded or shall have complied with the decision of the arbitration board. If service shall have been thus suspended for a period of 10 days, such contract, at the option of the distributor, may then be canceled. No member or distributor having so suspended service shall thereafter resume service unless and until the exhibitor shall have furnished the security demanded or shall have complied with the decision of the arbitration board.

Assuming the contracts and the system of compulsory arbitration to have been just and reasonable in operation, the fact that many exhibitors were not represented in the conferences leading to their adoption cannot be disputed. One can hardly imagine a more direct restraint upon trade than an agreement between competitors in an open market not to trade except upon terms which they have fixed in advance. But it is argued that the terms of the standard exhibition contract were not unfair or unreasonable; that the system of compulsory arbitration has been of great advantage to exhibitors and distributors alike, and therefore that the agreement of the distributors to use only this form of contract in all their dealings, and to enforce its arbitration clauses by collectively refusing to deal with any exhibitor who fails to comply with them, is not an undue restraint of interstate commerce within the meaning of the statute as interpreted in the Standard Oil Case, 221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834 Ann. Cas. 1912D, 734, and the American Tobacco Case, 221 U. S. 106, 31 S. Ct. 632, 55 L. Ed. 663. In judging the inherent character of the restraint one must look not only to the restraint voluntarily imposed upon the competitive activities of those who are in the combination, but also to the involuntary restraint imposed upon the freedom of outsiders to engage in trade under natural and normal conditions. It is therefore not enough to say that competition between distributors is keen and active, or even that it has been promoted and enhanced by what has been done, if, in fact, it can be seen that the freedom of others to engage in trade, to enter into normal commercial agreements, and to have recourse to the courts for their rights, has been unduly restrained by the coercive and collective action of the defendants. That competition between the distributors has been promoted by the adoption of the standard exhibition contract, and that in many ways general trade conditions have been vastly improved, I have no doubt, and so

find. But the record is equally clear that all this good has been accomplished through the exercise of irresistible economic force consolidated by combination in the hands of the distributors, who collectively control the available supply of films and by virtue of this control have imposed their will upon the industry. By agreement of these distributors, exhibitors who were not represented in the adoption of the uniform contracts have been constrained to accept their terms regardless of their wishes, and by the compulsory system of arbitration, sanctioned and enforced by the collective action of the distributors, have been constrained to perform the contractual obligations thus assumed. In fairness it cannot be said that the restraint imposed upon these exhibitors is voluntary because they accept and agree to be bound by the contracts. They can have none other, because the defendants have agreed that they shall not; and, unless something more than the mere acceptance of all they can get is shown, they must be said to have acted under an involuntary restraint, imposed and continued by the defendants to the end that the contracts shall be signed and their terms obeyed. That such coercive restraint upon the commercial freedom of an exhibitor, who was neither represented nor consulted with reference to the agreement to adopt the standard form of contract, is undue and unreasonable, both at common law and under the Sherman Act, I cannot doubt. Gains resulting from such restraints to the industry as a whole do not in the eyes of the statute justify the vicarious sacrifice of the individual, even for the sake of bigger and better business. A state Legislature could not lawfully impose compulsory arbitration upon the motion picture industry. Wolff Packing Co. v. Court of Industrial Relations of State of Kansas, 262 U. S. 522, 43 S. Ct. 630, 67 L. Ed. 1103, 27 A. L. R. 1280. Much less should it be within the power of a combination of practically all the distributors to do so by coercion exercised through control of the available supply of films.

The decision in United States v. First National Pictures, Inc., supra, is distinguishable because in that case the collective power of the defendants was exercised to correct fraudulent and irregular trade practices by demanding reasonable security for the performance of new contracts. Under the circumstances there disclosed there was nothing oppressive in what was done pursuant to the credit rules. This case presents an entirely different situation. The distinction lies in the inherent nature of the restraints imposed, and in the instant case the restraint, if not shown to have been voluntary on both sides, is oppressive, and therefore undue and unreasonable.

■ Nothing that has been said should be taken in derogation of the right of trade or commercial groups, or of traders generally, to voluntarily impose upon themselves standard forms of agreement which do not unduly restrict competition and thus restrain trade, or to agree that all controversies arising between them shall be settled by arbitration. Such agreements dealing only with the rights of those who execute and intend to be bound by them are normal and usual, and are proper instruments in the lawful conduct of trade. It is only when such agreements are sought to be imposed upon others, regardless of their wishes, by coercive combinations having the power to say "Take what is offered or get nothing," that they become illegal.

Upon settlement of the decree the parties may suggest provisions, if such be feasible, under which uniform contracts containing arbitration clauses may be voluntarily adopted by the members of this industry without coercion or other unlawful restraint.