O’NIELL, Chief Justice.
 

 This is a suit to collect from the Paramount Publix Corporation, domiciled in New York, a license tax for the business of leasing and distributing motion picture films, at a branch office, called an exchange, in New Orleans, during the years 1930, 1931 and 1932. The defendant pleaded that the business which the state was seeking to tax was interstate commerce, and therefore exempt from state taxation, by the commerce clause in the Constitution of the United States, article 1, § 8, cl. 3, reserving to the Congress the power to regulate commerce among the several states. The judge who tried the case, deciding that the business, for which the state is seeking to collect the license tax, was not interstate commerce, gave judgment in favor of the state. The defendant has appealed from the decision.
 

 The only question is whether the defendant’s business, for which the state is seeking to collect the license tax, is interstate commerce. The method of conducting the business is not disputed. Paramount Pub-lix Corporation is, as we have said, a New York corporation, and has its domicile and principal business establishment in New York City, and a branch office, called a film exchange, in New Orleans, in charge of a local manager, employed by the corporation. The' local exchange solicits from the proprietors of motion picture theaters, called exhibitors, in an area which includes Louisiana and a' part of Mississippi, a part of Alabama and a part of Florida, applications for leases of motion picture films produced by the Paramount Publix Corporation. In some instances the applications are for films already produced, but in most instances the applications are for films to be produced. The printed applications, signed by the exhibitors, are forwarded to the New York office for acceptance. When an application is rejected by the New York office, the exhibitor who made the application is so notified; and that ends the transaction. When an application is accepted by the New York office, it becomes a contract, termed a “lease,” between Paramount Publix Corporation and the exhibitor who made the application, and a signed copy of the contract is sent to the exhibitor, and an unsigned copy is sent to the exchange in
 
 New
 
 Orleans. The Paramount Publix Corporation is then under obligation, as lessor, to deliver the motion picture film or films to the exhibitor, as lessee. The films or photoplays are produced by the Paramount Publix Corporation in Hollywood, Cal., or in New York — -some in each city — none elsewhere. In compliance with the terms of the contract, the Paramount Publix Corpora-
 
 *821
 
 ton ships the picture films, either by parcel post or by express, to the exchange in New Orleans, and the manager of the exchange delivers them, respectively, to the lessees, throughout the territory including Louisiana, part of Mississippi, part of Alabama and part of Florida. The films that are leased to exhibitors outside of New Orleans are sent to. them by the exchange either by parcel post or by
 
 express,
 
 with instructions whether to return them to the exchange or to forward them to another exhibitor at the end of the term of the lease. In every instance the film is returned to the New Orleans exchange by the exhibitor who last exhibited it, and is sent back to New York by the exchange.
 

 The printed applications, which are signed first by the exhibitors and forwarded to New York for acceptance, contain the stipulation that the instrument shall be deemed an application for a license to exhibit the photo-play and shall not become binding until accepted in writing, without alteration or change, by an officer of the corporation, called the distributor, or by a person duly authorized by the distributor, and until notice of acceptance is sent to the exhibitor.
 

 The license tax is claimed under section 8 of Act No. 205 of 1924, p. 333, and under section 25, as amended by section 3 of Act No. 241 of 1928, p. 350, and is graduated according to the gross annual receipts from the business. In calculating the amount of the license tax sued for, the state made allowance for the amount of the gross receipts from leases of films that were sent by the New Orleans exchange to exhibitors in Mississippi, Alabama and Florida. The state made an allowance also of $68,456.88 of gross receipts from leases for which the invoices or billings were sent from New York directly to lessees in Louisiana. The state made allowance also for the license taxes paid by the defendant for the'three years. The judgment rendered in the case, amounting to $3,371, plus interest, attorney’s fees and costs, includes $95 for license taxes on the business of selling advertising matter in Louisiana — $50 being for such business done in 1930, $25 for such business done in 1931 and $20 for such business done in 1932. It is conceded by the defendant, appellant, that these items, amounting to $95, for license taxes on the advertising business, are correct, and that the business was intrastate business, and therefore subject to the license tax. The only license taxes that are in dispute are those which are based upon the gross receipts from the leases of films that were delivered by the New Orleans exchange to lessees in Louisiana, in compliance with the contracts which we have described, and in pursuance of the method of the business, which we have described.
 

 The short question in the case is whether the interstate transaction ended when the films, which were shipped from New York or California, arrived at the exchange in New Orleans. It could not be disputed that, if these films had been shipped from New York or California direct to the lessees in Louisiana, the transactions would have been interstate commerce. Our opinion is that the shipping of the films to the shipper’s exchange in New Orleans, to be delivered to the lessees in Louisiana, pursuant to the contract made in New York, did not put an end to the interstate character of the transaction, because it was not a completion of the trans
 
 *823
 
 action, but was merely a convenient method of delivering the films to the lessees in Louisiana. The state does not levy the license tax upon, or attempt to impose it upon, the mere delivering or distributing of the films by the exchange in New Orleans to the lessees in Louisiana. The tax is said to be levied, and is sought to be imposed, upon, “the business of leasing and distributing of motion picture films” in Louisiana. The distributing or delivering which the New Orleans exchange did in Louisiana was not an independent transaction, but was merely an essential part of the performance of the lessor’s obligation under the contract of lease, made in New1 York.
 

 In the case of Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 99, 68 L. Ed. 308, it was held that the business of leasing and distributing photoplays, or motion picture films — the method of conducting the business in that case being described exactly as it is described here — was interstate commerce. The court, after disposing of a motion to dismiss the writ of error, depending upon a question of jurisdiction, in that ease, said:
 

 “We come, then, to consider whether the averments of the complaint are sufficient to constitute a cause of action under the AntiTrust Act, and this inquiry involves two questions: (1) Are the alleged transactions in which the exhibitor was engaged matters of interstate commerce? And (2) Do the alleged acts of the defendants in error constitute a combination or conspiracy in restraint thereof?
 

 “1. The film contracts were between residents of different states, and contemplated the leasing by one to the other of a commodity manufactured in one state and transported and to be transported . to and used in another. The business of the distributors of which the arrangement with the exhibitor here was an instance was clearly interstate. It consisted of manufacturing the commodity in one state, finding customers for it in other states, making contracts of lease with them, and transporting the commodity leased from the state of manufacture into the states of the lessees. If the commodity were consigned directly to the lessees, the interstate character of the commerce throughout would not be disputed. Does the circumstance that in the course of the process the commodity is consigned to a local agency of the distributors, to be by that agency held until delivery to the lessee in the same state, put an end to the interstate character of the transaction and transform it into one purely intrastate? We think not The intermediate delivery to the agency did not end and was not intended to end the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination. The general rule is that where transportation has acquired an interstate character ‘it continues at least until the load reaches the point where the parties originally intended that the movement should finally end.’ Illinois Cent. R. Co. v. De Fuentes, 236 U. S. 157, 163, 59 L. Ed. 517, 519, P. U. R. 1915A, 840, 35 S. Ct. 275, 276. And see, Western Union Tel. Co. v. Foster, 247 U. S. 105, 113, 62 L. Ed. 1006, 1015, 1 A. L. R. 1278, P. U. R. 1918D, 865, 38 S. Ct. 438; Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 349, 61 L. Ed. 1181, 1183, 37 S. Ct. 623.”
 

 Here, in the Binderup Case, the court quoted extensively from Swift & Co. v. United
 
 *825
 
 States, 196 U. S. 375, 398, 25 S. Ct 276, 49 L. Ed. 518, and from Stafford v. Wallace, 258 U. S. 495, 516, 42 S. Ct 397, 66 L. Ed. 735, 741, 23 A. L. R. 229, in which cases it was held that the
 
 system
 
 of doing business was interstate commerce and therefore subject to 'federal regulation, under the Act of July 2, 1890 (26 Stat. 209, c. 647 [15 USCA §§ 1-7, 15 note]) “to protect trade and commerce against unlawful restraints and monopolies,” or under the Packers and Stockyards Act, approved August 15,1921 (7 USCA § 181 et seq.), notwithstanding some of the transactions which constituted the system of doing business were, in themselves, intrastate transactions.
 

 The attorney for the tax collector, in this case, contends that the decision in Binderup v. Pathe Exchange is not appropriate here, because the Binderup Case was brought under the provisions of the Anti-Trust Act, chapter 647, 26 Stat. 210, § 7 (15 USCA § 15 note); and the attorney cites, in support of his contention, this expression in the opinion rendered in the Binderup Case, viz.: “The cases cited by defendants in error, upholding state taxation as not constituting an interference with interstate commerce, are of little value to the inquiry here. It does not follow that because a thing is subject to state taxation it is also immune from federal regulation under the Commerce Clause. Stafford v. Wallace, supra, 258 U. S. pages 525-527, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 245, 44 L. Ed. 136, 149, 20 S. Ct. 96.”
 

 What the court meant by the expression, “It does not follow that because a thing is subject to state taxation it is also immune from federal regulation under the Commerce Clause,” was that a business transaction, or system of doing business, might be entirely within one state, and be therefore subject to state taxation, and yet be a part of a more extensive system of doing business, of the character of interstate commerce, and therefore subject to federal regulation. That is made plain by a reference to the two decisions cited, Stafford v. Wallace, and Addyston Pipe & Steel Co. v. United States. For example, in Stafford v. Wallace, the court, after reviewing a long line of decisions on the subject, quoted from the Minnesota Rate Cases (Simpson v. Shepard) 230 U. S. 352, 432, 433, 33 S. Ct. 729, 57 L. Ed. 1511, 1555, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, thus: “The authority of Congress extends to every part of interstate commerce, and to every instrumentality and agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere.”
 

 And in Addyston Pipe & Steel Co. v. United States, where the court enjoined six manufacturers of iron pipe from maintaining or carrying out a contract or combination in restraint of interstate trade or commerce, in
 
 *827
 
 violation of the Anti-Trust Act, of July 2, 1890, 26 Stat. 209, c. 647, it was held that the court had not jurisdiction to enjoin the defendants from maintaining or carrying out the contract or combination in the selling of pipe in the state in which it was manufactured. The court, therefore, modified the decree of the Circuit Court of Appeals, 85 F. 271, 46 L. R. A. 122, which enjoined the defendants from maintaining the contract or combination and from doing any business under such combination; and, in so modifying the decree, the court said: “Although the jurisdiction of Congress over commerce among the states is full and complete, it is nqt questioned that it has none over that which is wholly within a state, and therefore none over combinations or agreements so far as they relate to a restraint of such trade or commerce. It does not acquire any jurisdiction over that part of a combination or agreement which relates to commerce wholly within a state, by reason of the fact that the combination also covers and regulates commerce which is interstate. The latter it can regulate, while the former is subject. alone to the jurisdiction of the state.”
 

 As we have said, if the mere deliveries or distributions of the films of the Paramount Publix Corporation, by the exchange in New Orleans, were separate and independent business transactions, and not merely the fulfillment of the original interstate contracts and shipments, the occupation of delivering or distributing the films might be made the subject of state taxation, even though the Paramount Publix Corporation’s entire system of doing business is, as the court decided in the Binderup Case, interstate commerce, subject to control under the AntiTrust Act. But the state has not levied the license tax upon the occupation merely of delivering or distributing the motion picture films, and is not seeking to collect the tax merely for such an occupation, but is seeking to collect the tax for “the business of leasing and distributing of motion picture films.”
 

 The United States Circuit Court of Appeals, for the Second Circuit, in Fox Film Corporation v. Federal Trade Commission, 296 F. 853, 354, followed the ruling in the Binderup Case, thus: “Under the authority of the Act of September 26, 1914 (38 Stat. 717, Comp. Stat. § 8836a [15 USCA § 41 et seq.]), the respondent filed a complaint against the petitioner, alleging that it was engaged in the production of photoplays, and leased and ■ sold its products to the owners and operators of moving picture theatres throughout the United States, granting the right to exhibit said photoplays to the public. It is admitted that the petitioner, in leasing and selling to the exhibitors, maintains agencies at various cities in the several states of the United States. It makes positive photoplays produced by it and packs the same in such manner as to be adapted for use in motion picture projecting machines. These are called films, and the photoplays are known in the trade as releases. It ships to its agencies in several states from New York City. The petitioner is therefore engaged in interstate commerce. Binderup v. Pathe Exchange (Supreme Court, Nov. 19, 1923) [263 U. S. 291], 44 S. Ct. 96, 68 L. Ed. 308.”
 

 In the case of Fox Film Corporation v. Trumbull, Governor of Connecticut, 7 F.(2d) 715, 717, the United States District Court in that state declared the business done by
 
 *829
 
 the Fox Film Corporation to he interstate commerce, and described it as it is described in the record before us, thus:
 

 “The Fox Film Corporation is a New York corporation, with its principal place of business in the city of New York. It appears that all the photoplay negative and positive films produced by it are made in the states of New York and California and are copyrighted. None is made in Connecticut. The plaintiff solicits, through its agents in Connecticut, contracts to exhibit its positive films under contracts which are signed in Connecticut and sent to New York for acceptance by plaintiff, and, when accepted there, returned to the exhibitor in Connecticut. Films sent for exhibition pursuant to these contracts are forwarded from points outside of the state of Connecticut to the branch office of the plaintiff at New Haven, Conn., whence they are delivered to the exhibitor pursuant to such contracts. * * *
 

 “After the exhibitor has signed the printed contract in which he agrees to exhibit the copyrighted photoplay at his theater and to pay the specified rental, the contract is forwarded from Connecticut to New York, where, if it is approved, it is signed by an officer of the film corporation. The contract contains a provision stating that it is an application for a contract only, is not to become binding until it has been accepted in writing by an officer of the film corporation, and notice of acceptance has been sent to the exhibitor by mail or telegraph.
 

 “Pursuant to contracts made as above described, plaintiff either ships from New York directly to the exhibitor in the state of Connecticut the positive prints of the photoplays to be exhibited pursuant to said agreements, such shipment being made either by parcel post, by express, or by truck, or such shipment is made by parcel post or express to a branch office of the film corporation in the city of New Haven, Conn., known as its New Haven exchange, which receives said positive prints from the carrier and makes delivery of the same to the exhibitor, to be exhibited pursuant to the agreement made as aforesaid. In some instances films are delivered at the plaintiff’s branch office in New Haven a few days in advance of the date when the same are to be exhibited, but all films belonging to plaintiff at any time in its branch office at New Haven are films which are on their way from the film corporation’s laboratories outside of the state of Connecticut to the exhibitor in Connecticut, or are films which have been returned by an exhibitor to the branch office for the purpose of either being returned to the film corporation in New York or elsewhere outside the state of Connecticut, or of being delivered by the branch office to another exhibitor. * * *
 

 “The • business in which the plaintiffs in these two suits are engaged is clearly interstate commerce. That is determined for us by the decision in Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308, as well as by the decision of the Circuit Court of Appeals in this circuit in Fox Film Corporation v. Federal Trade Commission, 296 F. 353.”
 

 In the case of United States v. First National Pictures, Inc., 34 F.(2d) 815, the United States District Court, in New York, described the business of the First National Pictures, and of other' distributors, and declared it to be interstate commerce, thus:
 

 
 *831
 
 “Throughout ‘the United States there are upwards of 25,000 motion picture theatres, at which- motion pictures are exhibited for the entertainment of the public. To these theatres motion picture films — i. e., the positive prints from which the pictures are projected upon the screen — are distributed by the defendants and other distributors, who either produce the films themselves or procure them for distribution from other producers. The process of distribution is highly organized, necessarily so, because each of the exhibitors must be regularly supplied with sufficient films to exhibit throughout the year, constantly changing programs. In order to meet this demand, each of the defendant distributors maintains exchanges in the principal centers of distribution throughout the United States, from which films are delivered to the exhibitors, and to which théy are returned after exhibition. * * *
 

 “The delivery 'of films through the exchanges in performance of the exhibition contracts, and the redelivery thereof to the exchanges, is interstate commerce of a very substantial character. Binderup v. Pathe Exchange, 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308.”
 

 In another Connecticut case, Majestic Theatre Co. v. United Artists Corporation et al., 43 F.(2d) 991, 995, the United States District Court described the business of the distributors of photoplays, as it is described in the record before us, and pronounced it interstate commerce, thus: “The claim that the defendants are not engaged in interstate commerce is without merit in view of the decisions in Binderup v. Pathe Exchange, Inc., 263 U. S. 291, 44 S. Ct. 96, 68 L. Ed. 308; Fox Film Corp. v. Trumbull (D. C.) 7 F.(2d) 715; U. S. v. Paramount Famous Lasky Corporation (D. C.) 34 F.(2d) 984.”
 

 The most appropriate expression on this subject, and the one which we deem controlling in this case, is that which we quote from the Binderup Case, viz.: “Does the circumstance that in the course of the process the commodity is consigned to, a local agency of the distributors, to be by that agency held until delivery to the lessee in the same state, put an end to the interstate character of the transaction and transform it into one purely intrastate? We think not. The intermediate delivery to the agency did not end and was not intended to end the movement of the commodity. It was merely halted as a convenient step in the process of getting it to its final destination.”.
 

 That expression was referred to with approval in Industrial Association of San Francisco v. United States, 268 U. S. 79, 45 S. Ct. 403, 406, 69 L. Ed. 854, thus: “In Binderup v. Pathe Exch., 263 U. S. 291, 309, 68 L. Ed. 308, 316, 44 S. Ct. 96, a commodity produced in one state was consigned to a local agency of the producer in another not as a consummation of the transit, but for delivery to the customer. This court held that the intermediate delivery did not end, and was not intended to end, the movement of the commodity, but merely halted it ‘as a convenient step in the process of getting it to its final destination.’ ”
 

 That reason for the ruling in the Binderup Case was mentioned approvingly again in People’s Natural Gas Co. v. Public Service Commission of Pennsylvania, 270 U. S. 554, 46 S. Ct. 371, 70 L. Ed. 729, and again in Foster-Fountain Packing Co. v. Haydel, 278 U. S. 10, 49 S. Ct. 1, 73 L. Ed. 153.
 

 
 *833
 
 In Caldwell v. North Carolina, 187 U. S. 622-633, 23 S. Ct. 229, 47 L. Ed. 336, reversing a judgment of the Supreme Court of that state, 127 N. C. 521, 37 S. E. 138, affirming a conviction for a violation' of an ordinance of the city of Greensboro requiring a license tax or fee from persons engaged in selling or delivering picture frames or pictures, the court (187 U. S. 632, 23 S. Ct. 229, 233, 47 L. Ed. 341) said:
 

 “Nor does the fact that these articles were not shipped separately and directly to each individual purchaser, but were sent to an agent of the vendor at Greensboro, who delivered them to the purchasers, deprive the transaction of its character as interstate commerce. It was only that the vendor used two instead of one agency jn the delivery. It would seem evident that, if the vendor had sent the articles by an express company, which should collect on delivery, such a mode of delivery would not have subjected the transaction to state taxation. The same could be said if the vendor himself, or by a personal agent, had carried and delivered the goods to the purchaser. That the articles were sent as freight by rail, and were received at the' railroad station by an agent who delivered them to the respective purchasers, in nowise changes the character of the commerce as interstate.
 

 “Transactions between manufacturing companies in one state, through agents, with citizens of another, constitute a large part of interstate commerce; and for us to hold; with the court below, that the same articles, if sent by rail directly' to the purchaser, are free from state taxation, but, if sent to an ágent to deliver, are taxable through a license tax upon the agent, would evidently take a considerable portion of such traffic out of the salutary protection of the interstate commerce clause of the Constitution.”
 

 In Crenshaw v. Arkansas, 227 U. S. 389, 33 S. Ct. 294, 57 L. Ed. 565, reversing a judgment of the Supreme Court of Arkansas (95 Ark. 464, 130 S. W. 569) affirming a conviction before a justice of the peace for a violation of a state statute undertaking to regulate the sale of lightning rods, stoves or ranges, clocks, vehicles, etc., the court (227 U. S. page 401, 33 S. Ct. 294, 298, 57 L. Ed. 569) concluded its opinion thus: “Here, as the facts show, the sample ranges carried about from place to place are not sold. Orders are taken and transmitted to the manufacturer in another state for ranges to be delivered in fulfillment of such orders, which are in fact shipped in interstate commerce and delivered to the persons who ordered them. Business of this character, as well settled by the decisions of this court, constitutes interstate commerce, and the privilege of doing it cannot be taxed by the state.”
 

 In a companion of the Crenshaw Case, Rogers v. Arkansas, 227 U. S. 401, page 409, 33 S. Ct. 298, 299, 57 L. Ed. 569, page 573, the court said: “The manner in which the business of soliciting orders for and delivering vehicles was done by the Spaulding Manufacturing Company differs in no practical or material particular from that employed by the Wrought Iron Range Company in the case just decided (Crenshaw v. Arkansas). In fact, the only difference is that the ranges were shipped to the company, bearing no marks to identify the purchasers, and were delivered to the purchasers by the delivery men without distinction, while the vehicles were tagged at Memphis, and upon arrival in Arkansas were
 
 *835
 
 delivered by tbe delivery men to tbe purchasers whose names appeared upon the tags attached to the vehicles. This is merely a matter of detail in the manner in which the business is conducted, and does not affect its character. The decision in Crenshaw v. Arkansas, supra, has dealt with precisely the same statute and substantially the same facts, and controls the present cases.”
 

 McClellan, Tax Collector, v. Pettigrew, 44 La. Ann. 356, 10 So. 853, was very similar to Crenshaw v. Arkansas, and Rogers v. Arkansas; and from the syllabus of the decision we quote:
 

 “The agent of the manufacturer of clocks in another state, who takes orders for them in Louisiana, is not subject to the payment of a license tax.
 

 “The agent would be liable to the tax imposed by section 23, Act No. 150 of 1890, if the clocks had been shipped to Louisiana, and, after they had been located in Louisiana, the agent, by peddling them, disposed of them.
 

 “If the manufacturer in another state sends an agent to Louisiana to find a purchaser for his manufactured goods still at the factory, and he takes orders, and the goods are shipped directly to the agent, to be delivered to the purchaser, he is not liable to said license tax imposed by said act. It is immaterial whether the sale is perfected by delivery. The clause of the Constitution of the United States which declares that Congress shall have the power to regulate commerce among the several States extends to negotiations for the sale of manufactured articles solicited in another State. Therefore any license tax imposed upon an agent or solicitor for soliciting orders for said goods by sample is in violation of said clause of the Constitution of the United States.”
 

 The attorney for the tax collector, in this case, cites and relies upon the rulings in the following cases: American Steel & Wire Co. v. Speed, Clerk of the County Court of Shelby County, 192 U. S. 500, 24 S. Ct. 365, 48 L. Ed. 538; Browning v. City of Waycross, 233 U. S. 16, 34 S. Ct. 578, 580, 58 L. Ed. 828; Sonneborn Bros. v. Cureton, 262 U. S. 506, 43 S. Ct. 643, 67 L. Ed. 1095, and East Ohio Gas Co. v. Tax Commission of Ohio, 283 U. S. 465, 51 S. Ct. 499, 75 L. Ed. 1171.
 

 In the American Steel & Wire Co. Case, the tax which was declared valid was called a “merchants’ tax,” levied upon those engaged in dealing in any kind of goods, wares or merchandise, and was based upon the average amount of capital invested in the business. It appears that the tax was in the nature of, and in lieu of, an ad valorem tax on the merchandise. The contention of the American Steel & Wire Company was that its goods brought into Tennessee from another state were
 
 imported,
 
 and hence protected from taxation in the original packages, by paragraph 2 of section 10 of article 1 of the Constitution of the United States, forbidding the states, without the consent of the Congress, to'lay any impost or duty on imports or exports. Referring to Brown v. Maryland, 12 Wheat. 436, 6 L. Ed. 684, the court held that goods brought from one state into another were not “imported,” within the meaning of the clause on the subject in the Constitution of the United States. Hence the court held that the merchants’ tax levied by the state of
 
 *837
 
 Tennessee was not violative of the clause referred to. The decision is not appropriate here.
 

 In Browning v. City of Waycross, the tax in contest was an occupation tax of $25 per annum levied by the municipality upon “lightning rod agents or dealers engaged in putting up or erecting lightning rods within the corporate limits” of the city of Waycross. The court held that the levying of the tax was not an interference with interstate commerce, notwithstanding the defendant, Browning, as agent for a Missouri corporation, solicited the orders for the sale of the lightning rods in Waycross, Ga., received the rods shipped to him from St. Louis and erected them for the corporation, and notwithstanding the price paid for the rods included the duty of the agent to erect them. The decision was founded upon the proposition that the occupation of erecting lightning rods was a taxable occupation, no matter where the rods came from. In so deciding, the court said: “Of course we are not called upon here to consider how far interstate commerce might be held to continue to apply to an article shipped from one state to another, after delivery and up to and including the time when the article was put together or made operative in the place of destination in a ease where, because of some intrinsic and peculiar quality or inherent complexity of the article, the making of such agreement was essential to the accomplishment of the interstate transaction. In saying this we are not unmindful of the fact that some suggestion is here made that the putting up of the lightning rods after delivery by the agent of the seller was so vital and so essential as to render it impossible to contract without an agreement to that effect — a suggestion, however, which we deem it unnecessary to do more than mention in order to refute it.”
 

 In the Sonneborn Case, the court pointed out the distinction between the business of selling goods
 
 after
 
 their arrival from one state into another, and the business of selling the goods
 
 before
 
 their shipment from one state into another. The decision, therefore, is not appropriate here, as we shall show by italicizing the distinguishing words in the first and second paragraph of the syllabus, which we quote, viz.:
 

 “1. An occupation tax upon a dealer in oil which had been transported into the state and held for sale in original packages of transportation, and
 
 subsequently sold
 
 and delivered in the state in such packages, is not an unconstitutional regulation of, or burden upon, interstate commerce, where the tax is uniform on all oil dealers in the state.
 

 “2. Sales of oil in original packages
 
 before the oil to fulfill the sales has reached the state,
 
 and the solicitation of orders for such oil, are not, in view of the commerce clause of the Federal Constitution, subject to taxation by a state.”
 

 In the East Ohio Gas Company Case, it was held that the business of selling and distributing natural gas to consumers in municipalities within' the state was not interstate commerce, notwithstanding the gas came from sources outside of the state, because the passing of the gas from the pressure-reducing station into the local distributing system, reducing the large compressed volume of gas to
 
 *839
 
 a low pressure, fit for consumption, was such a treatment of the gas as to be
 
 like the
 
 breaking up of an original package after shipment in interstate commerce, in order that its contents might be prepared for sale and sold at retail. We quote the fifth paragraph of the syllabus of the decision, viz.: “5. The transportation of natural gas from sources outside a state for sale to local consumers in municipalities within the state ceases to be interstate commerce at the point where it is passed from a pressure-reducing station into local distributing systems; the treatment and division of the large compressed volume of gas being like the breaking of an original package after shipment in interstate commerce in order that its contents may be treated, prepared for sale, and sold at retail.”
 

 Our conclusion is that the license tax in contest, on the business of leasing and distributing motion pictures films, is not valid. The judgment appealed from, therefore, must be reversed in that respect, and the amount thereof reduced to
 
 the
 
 amount of the license tax levied upon the local advertising business.
 

 The judgment appealed from is reversed in so far as the license tax in contest is levied upon the business of leasing and distributing motion picture films, and, accordingly, the amount of the judgment is reduced to $95, plus interest at 2 per cent, per month on $50 from March 1, 1930, on $25 from March 1, 1931, and on $20 from March 1, 1932, until paid, and plus 10 per cent, for the attorney’s fee on the $95 and interest. The appellant is to pay the costs incurred in the civil district court, including the fee' of the auditor appointed by the judge.